

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

SEEMONA SUMASAR and CHARLES McDONALD

Plaintiffs

v.

THE CITY OF NEW YORK; NEW YORK CITY POLICE DETECTIVE JAMES CONLON; NEW YORK CITY POLICE DETECTIVE MARISA VALLE; NASSAU COUNTY; NASSAU COUNTY POLICE DETECTIVE LISA CHARLES; NASSAU COUNTY POLICE DETECTIVE DEBORAH CARTER BERSHAD; NASSAU COUNTY POLICE DETECTIVE JOSEPH BRADY; NASSAU COUNTY POLICE DETECTIVE ROBERT NILL; NASSAU COUNTY POLICE OFFICER MICHAEL KNATZ; and JOHN AND JANE DOES 1-10

Defendants.

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ DEC 0 1 2011 ★
BROOKLYN OFFICE

**COMPLAINT**
**AND**
**JURY DEMAND**

CV11-5867

WEXLER,

BOYLE, M.J.

Plaintiff Seemona Sumasar, by and through her attorneys, the law firm of Neufeld Scheck and Brustin, LLP, states as follows:

## INTRODUCTION

1.    In late 2009 and early 2010, a rapist devised a scheme to silence his victim: framing her for impersonating a police officer in two different New York jurisdictions. The scheme was poorly conceived and bumblingly executed. Authorities should have exposed it as a preposterous hoax. Instead, police and prosecutors ignored the evidence in front of them, and

1

refused to investigate the victim's specific, readily verifiable protestations of innocence. Even worse, police aided and abetted the rapist by concealing information in their possession about the rapist and fabricating additional evidence against the victim. For the victim, plaintiff Seemona Sumasar, the horror of the brutal rape by her ex-boyfriend metastasized as she was jailed for six months for crimes that never happened.

2. On March 8, 2009, Plaintiff Seemona Sumasar, a single mother and successful businesswoman, was brutally attacked in her home by her ex-boyfriend, Jerry Ramrattan. Ramrattan caught her on the back stairs leading to her Queens apartment. He bound her with duct-tape, menaced her with a gun and raped her.

3. When Ms. Sumasar dated Ramrattan, she believed, based on his representations, that he was a law enforcement officer. She had no idea that he was a convicted felon with a history of robbery, weapons offenses and fraud as well as threatening, intimidating and even framing others, all augmented by a penchant for impersonating a police officer.

4. However, Ramrattan and his criminal history were well known to law enforcement officials in Queens and the rest of New York City, as well as in Nassau County. Ramrattan was an informant or cooperator for New York Police Department ("NYPD") officers and/or precincts and had personal and professional relationships with numerous NYPD officers.

5. These law enforcement connections had helped him to avoid criminal charges in the past. For instance, some years before raping Ms. Sumasar, he had used his law enforcement connections to intimidate another woman who accused him of rape into withdrawing the accusation.

6. Ms. Sumasar proved impossible to intimidate. Instead, in order to prevent Ms. Sumasar from testifying against him for the rape, Ramrattan drew on his own criminal history by

2

inducing various friends and acquaintances to call police and falsely claim that Ms. Sumasar had robbed them at gunpoint while posing as police officer.

7.      Ramrattan set this poorly conceived scheme in motion in mid-September 2009, when one of his acquaintances falsely reported to the NYPD that he had been robbed in Queens Village, Queens. A second acquaintance reported a second fictional robbery in Long Island City, Queens to the NYPD two days later. More reports with increasingly obvious attempts to spoonfeed the police Ms. Sumasar as a suspect followed over the next few months.

8.      Despite their knowledge of Ramrattan and his history, police ignored the evidence in front of them and steadfastly refused to investigate Ms. Sumasar's readily verifiable protestations of innocence, including her rock-solid alibi and the many and obvious links between Ramrattan and the complainants. Rather than protecting Ms. Sumasar and the public by preserving her right and opportunity to testify against the man who raped her by doing the minimal work required to unravel Ramrattan's poorly conceived scheme, police not only concealed their knowledge of and relationships with Ramrattan but also fabricated evidence against Ms. Sumasar to make her appear guilty of the crimes alleged by Ramrattan's friends and acquaintances.

9.      Unable to obtain bail because of police lies, Ms. Sumasar spent more than six months in jail. She was torn away from her twelve year-old daughter, Chiara McDonald. She also lost her business and her good name, and her home went into foreclosure.

10.      Police refused to investigate even after being told by a Queens man that he had been approached by Ramrattan to participate in the scheme as a fake victim.

11.      When police finally deigned to consider her protestations of innocence, they readily found enough evidence of Ramrattan's scheme to demonstrate Ms. Sumasar's innocence,

3

secure her release and justify the arrest and prosecution of Ramrattan and his accomplices.

12.     Ramrattan was ultimately indicted by a Queens grand jury and tried in Queens for all of his crimes against Ms. Sumasar – from the rape to the frame-up – while three of his accomplices pled guilty to perjury.  On November 23, 2011, a Queens jury found Ramrattan guilty of all eleven charges against him.

13.     Jerry Ramrattan's scheme would not have been successful but for the deliberate misconduct and reckless lapses by law enforcement enumerated herein.

14.     This action seeks to identify and expose the egregious police misconduct that caused this tragedy.  It further seeks to vindicate Seemona Sumasar's constitutional rights, to compensate her for the more than six months stolen from her, the business she lost, and the suffering she and her daughter Chiara have endured and will continue to endure into the future from this trauma.

## JURISDICTION

15.     This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

16.     Supplemental jurisdiction over Ms. Sumasar's state-law claims exists pursuant to 28 U.S.C. § 1367(a).

17.     Ms. Sumasar has complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the County Attorney of Nassau County on February 25, 2011, which she amended on May 23, 2011, and on the Corporate Counsel of New York City on February 25, 2011, which she amended on May 23, 2011. Those notices were served within the time required by New York General Municipal Law Section 50-e, and more than thirty days have elapsed since the service of those notices.

4

18.     At the request of Nassau County and the City of New York, on September 8, 2011, Ms. Sumasar submitted to a hearing pursuant to New York General Municipal Law Section 50-h.

## VENUE

19.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Eastern District of New York, the judicial district in which the claims arose.

## JURY DEMAND

20.     Pursuant to the Seventh Amendment of the United States Constitution, Ms. Sumasar requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

21.     Plaintiff Seemona Sumasar is and was at all times relevant to this Complaint a citizen and resident of the State of New York.  She is a lawful permanent resident of the United States of America. She currently resides in Queens.

22.     Plaintiff Chiara McDonald, is and was at all times relevant to this Complaint a juvenile citizen and resident of the State of New York.  She currently resides with her mother, plaintiff Seemona Sumasar, in Queens.

23.     Defendant City of New York is a municipality that is a political subdivision of the State of New York.

24.     Defendant James Conlon was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of New York City  and the State of New York. He is entitled to

5

indemnification under N.Y. Gen. Mun. Law § 50-k and by contract.

25.     Defendant Marisa Valle was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of New York City and the State of New York. She is entitled to indemnification under N.Y. Gen. Mun. Law § 50-k and by contract.

26.     Defendant Nassau County is a municipality that is a political subdivision of the State of New York.

27.     Defendant Lisa Charles was at all times relevant to this Complaint a duly appointed and acting Detective of the Nassau County Police Department ("NCPD"), acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York. She is entitled to indemnification under N.Y. Gen. Mun. Law §§ 50-j and 50-l and by contract.

28.     Defendant Deborah Carter Bershad was at all times relevant to this Complaint a duly appointed and acting Detective of the NCPD, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York. She is entitled to indemnification under N.Y. Gen. Mun. Law §§ 50-j and 50-l and by contract.

29.     Defendant Joseph Brady was at all times relevant to this Complaint a duly appointed and acting Detective of the NCPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.  He is entitled to

6

indemnification under N.Y. Gen. Mun. Law §§ 50-j and 50-l and by contract.

30.     Defendant Robert Nill was at all times relevant to this Complaint a duly appointed and acting Detective of the NCPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.  He is entitled to indemnification under N.Y. Gen. Mun. Law §§ 50-j and 50-l and by contract.

31.     Defendant Michael Knatz was at all times relevant to this Complaint a duly appointed and acting Detective of the NCPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County and the State of New York.  He is entitled to indemnification under N.Y. Gen. Mun. Law §§ 50-j and 50-l and by contract.

32.     Defendants Does #1-10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designations "John Doe" and "Jane Doe," represent those officers, detectives, supervisors other agents and employees of the NYPD, and the NCPD,  acting under color of law and in their individual capacities within the scope of employment or agency pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Nassau County, New York City and State of New York, who participated in the misconduct described herein.  They are entitled to indemnification under N.Y. Gen. Mun. Law §§ 50- j, 50-k and 50-l and by contract.

## FACTUAL ALLEGATIONS

### Seemona Sumasar

33.     Seemona Sumasar is a single mother, homeowner and hardworking businesswoman.  From 1987, when she emigrated from her native Guyana to the United States, until 2009, she lived the American dream.  She attended Queens College for two years, and after

7

college, began a career in the financial services industry. Over the course of the next decade she held positions with the back offices of two Wall Street investment banks, earning a comfortable salary.

34.     Ms. Sumasar's daughter, Chiara, was born in 1998. By 2009, with Ms. Sumasar's love, guidance and attention, Chiara had blossomed into an honors student in the 7th grade. Chiara has always lived with Ms. Sumasar, with frequent visits to her father, Devon McDonald, with whom Ms. Sumasar remains close.

35.     Ms. Sumasar, with her family, owned a multifamily apartment house in the Far Rockaway neighborhood of Queens. Ms. Sumasar lived in one unit with her daughter Chiara and rented out the other units.

36.     Although Ms. Sumasar enjoyed success in the financial services industry, the long commute between Ms. Sumasar's home in Queens and her job in Manhattan gave her less time with her daughter than she wanted. In 2005, she decided to open a business closer to home. She contracted with Golden Krust Bakery to open a franchise of the Caribbean food restaurant on a corner of Liberty Avenue in Queens.

37.     To ensure that she would have the resources for renovations and other start-up costs while supporting herself and her daughter, she undertook a great personal sacrifice: for two years, she worked her job at the investment bank during the day and at night worked at her restaurant, which opened for business in 2006. By 2008, Ms. Sumasar was able to leave her job in Manhattan and work exclusively at the restaurant in Queens, near her home and her daughter.

### Jerry Ramrattan

38.     In 2007, Ms. Sumasar began a romantic relationship with Jerry Ramrattan. In time she allowed him to stay at her apartment regularly.

39.     Ramrattan presented himself and appeared to be an investigator working for the

8

Brooklyn District Attorney, with connections to other law enforcement agencies including the New York Police Department. He showed Ms. Sumasar a gun, a badge and a bulletproof vest and took her to the Brooklyn District Attorney's Office, where he introduced her to people he told her were his colleagues and with whom she heard him discussing cases.

40.    On numerous occasions she saw him speak to NYPD officers on collegial terms.

41.    Ramrattan also had a private investigation company, Most Wanted, Inc. On internet pages set up for his business, he presented himself as "NYPD former law enforcement" capable of "fixing anything . . . at any times" and posted a picture of himself holding an automatic rifle. A true and correct copy of Ramrattan's LinkedIn profile, accessed on June 31, 2011, is attached as Exhibit 1.

42.    Unbeknownst to Ms. Sumasar, Ramrattan was not a legitimate law enforcement officer at all. In fact, Ramrattan had a serious criminal record including robbery and firearms convictions.

43.    On information and belief, Ramrattan's true connection to law enforcement was as an informant or cooperator for NYPD officers and/or precincts in Queens and/or other parts of New York City.

44.    Ramrattan also had a long history of intimidating and threatening others by falsely presenting himself as a police officer.

45.    Ramrattan's history of impersonating a police officer was known to law enforcement, including the New York Police Department, which, on information and belief, had investigated him for impersonating a police officer going back at least to 2007.

46.    Ramrattan also had a history of framing others for crimes they did not commit as a means to settle personal scores or otherwise achieve personal ends.

9

47.    This aspect of Ramrattan's history, too, was or should have been well known to law enforcement. For instance, in 2007, Ramrattan tried to frame a Nassau County man, falsely reporting to state police and Nassau County prosecutors that the man had left the scene of an automobile accident, identifying him by the color of his car and his license plate. Ramarattan then unsuccessfully attempted to collect insurance for fictional injuries from the fictional accident. In December of 2008, that Nassau County man notified the Nassau County District Attorney's Office about Ramrattan and the framing and insurance fraud scheme. Upon information and belief, this incident put Nassau County Police Department and the Nassau County District Attorney's Office on notice of Ramrattan's willingness to frame innocent persons.

48.    On information and belief, law enforcement, including the NYPD, was also aware that Ramrattan had a history of relying on his law enforcement connections and contacts to help him avoid charges for his criminal acts. For instance, some years before raping Ms. Sumasar, Ramrattan used his law enforcement connections to intimidate another woman who accused him of rape into withdrawing the accusation. That incident was in addition to yet another incident, also known to law enforcement including the NYPD, in which Ramrattan's family successfully pressured a woman who had accused him of rape to withdraw the accusation.

### The Relationship Ends

49.    Ms. Sumasar dated Ramrattan for less than a year, until she realized that much of what he had had told her about himself was untrue. In June 2008, she ended her relationship with him and barred him from her apartment.

50.    After he pleaded with her that he had no place to go, she allowed him to stay temporarily in a basement apartment in her building. Once there, however, he refused to leave,

occupying the space without paying rent and harassing her at every turn. Although she changed the locks on several occasions, he repeatedly broke into her home. He also haunted her outside of the house, showing up at her restaurant and at social events at which he had no reason to be present.

51.     Ms. Sumasar complained to her friends about the situation but was afraid to go to the police because of Ramrattan's apparent close connections with the NYPD and other law enforcement authorities. She knew at least one business owner and former friend of Ramrattan who began to receive frequent and harassing visits from NYPD at his business after falling out with Ramrattan.

52.     Moreover Ramrattan threatened that if she kicked him out of the basement apartment, he would try to ruin her business by instigating costly and time-consuming visits from various government agencies, including the Health Department and the Internal Revenue Service.

### Ramrattan Attacks, Imprisons and Rapes Ms. Sumasar

53.     On March 8, 2009, a Sunday when Ms. Sumasar's daughter was visiting her father and Ms. Sumasar was alone in her apartment, Ramrattan ambushed Ms. Sumasar on the back stairs outside her apartment as she was going to the basement to do laundry. Using duct tape, he bound her hands and legs and gagged her. He then dragged her into her apartment, and then later, to his basement apartment. Over the course of a terrifying eight or nine hours, he held her prisoner while he harangued her, threatened to commit suicide with his gun, menaced her with the same gun and raped her.

54.     Around midnight, after Ms. Sumasar begged him to allow her to bathe, Ramrattan finally cut the tape binding Ms. Sumasar, freeing her. She ran out of the basement apartment and up the stairs to her own apartment and locked herself in. After pleading with her through the

11

door not to tell anyone what he had done, Ramrattan packed his things and left the building for good. Ms. Sumasar then called the NYPD.

55.      The police took her to Queens General Hospital, where a rape kit was collected.

**Ramrattan Schemes to Prevent Ms. Sumasar from Testifying against Him**

56.      Ramrattan was arrested, charged, and eventually indicted by a Queens grand jury. In addition to investigating and prosecuting Ramrattan for sexual assault, the NYPD also investigated him for impersonating a police officer after Ms. Sumasar told them about his penchant for posing as a police officer and provided them with a picture of him wearing an NYPD uniform, including a police shield.

57.      After Ramrattan made bail, he began a campaign to force Ms. Sumasar to cease cooperating with the rape prosecution. Despite a restraining order mandating that he not contact her, he telephoned her to demand that she not go through with the case. He also sent a parade of friends and relatives to her restaurant to lobby her on his behalf. They told her that if she went through with the case, they and/or Ramrattan would make her life miserable.

58.      When Ms. Sumasar reported these visits to the police, she was told that nothing could be done unless Ramrattan tried again to contact her directly.

59.      When the entreaties from his friends and relatives proved ineffective, Ramrattan began to make good on his threats.

60.      Ramrattan first made complaints to the Health Department and similar agencies that resulted in Ms. Sumasar's restaurant being subject to repeated costly, time-consuming and baseless inspections.

61.      But Ramrattan quickly escalated to a more direct attack on Ms. Sumasar's credibility. Drawing on elements of his own history of illegal conduct, Ramrattan determined to frame Ms. Sumasar for committing armed robbery while posing as a police officer.

12

**Ramrattan Makes and Initial but Unsuccessful Effort to Frame Ms. Sumasar in Queens**

62. Ramrattan's scheme was from the start preposterous and poorly executed, with incredible witnesses telling incredible stories that were full of inconsistencies.

63. Only police misconduct – their refusal to investigate Ms. Sumasar's readily verifiable protestations of innocence and their willingness to ignore the evidence in front of them and instead conceal their knowledge of and relationships with Ramrattan as well as fabricate evidence against Ms. Sumasar – gave wings to Ramrattan's bumbling scheme.

64. Ramrattan began by inducing an illegal immigrant named Rajive Mohanlal to call a Queens precinct of the NYPD on September 15, 2009, and falsely report that he had been accosted and robbed by two people posing as police officers, aided by a third individual. Additionally, Ramrattan gave Mohanlal handcuffs and a bullet casing to plant at the scene.

65. Mohanlal alleged to the NYPD that a 5'2" Indian woman and a white or Hispanic man approached him from a grey Jeep Cherokee with a repair compound on the driver's door and a New York license plate; that they both wore badges around their necks; that the woman wore a bulletproof vest and brandished a pistol, from which she ejected a round before putting the gun to his head; that they stole $700 in cash from him; and as they were leaving, a black Nissan Maxima with Pennsylvania license plates pulled up, as if to offer assistance to the two people robbing him.

66. While Mohanlal's description of his female assailant was consistent with Ms. Sumasar, and the descriptions of the two vehicles involved in the alleged incident were consistent with Ms. Sumasar's friends' vehicles, which Ms. Sumasar sometimes drove, Mohanlal misstated the color of the Jeep Cherokee and failed to recount for police even a partial license plate for either vehicle.

67. Additionally, the handcuffs and bullet casing planted on the scene and later

13

collected by police had been touched by Mohanlal and Ramrattan, but never by Ms. Sumasar.

68. Because of these shortcomings, initially Mohanlal's claims were ineffective for framing Ms. Sumasar.

69. The NYPD officers and detectives assigned to the case appear to have regarded Mohanlal's story skeptically and made no serious effort to investigate it. For instance, no effort was made to determine whether Mohanlal had ever possessed the items he claimed had been stolen from him, or to determine the provenance of the handcuffs and bullet casing found at the scene.

70. Ramrattan then induced a long-time friend, Queens resident Christopher Conde, to call police two days later, on September 17, 2009, and falsely report that as he walked in Queens in the middle of the night, he was robbed by a female and two males posing as police officers. Conde alleged that his assailants had guns and badges, and traveled in a black Nissan Maxima with Pennsylvania plates and a Jeep Cherokee that he described once as metallic blue and another time as gold. Conde alleged that his assailants took his iPod and $424 in cash.

71. Conde's description of his female assailant was consistent with Ms. Sumasar's height and weight and Conde's description of a black man driving a black Nissan Maxima with Pennsylvania plates was consistent with Devon McDonald, the father of Ms. Sumasar's daughter Chiara, with whom Ms. Sumasar has always remained close. However, Conde also misidentified Ms. Sumasar as Hispanic, gave two incorrect and inconsistent descriptions of the color of the Jeep Cherokee that Ms. Sumasar sometimes drove, and failed to provide police with even a partial plate. Ramrattan's scheme again foundered.

72. On information and belief, as with the alleged Mohanlal incident, the NYPD made no serious effort to investigate this alleged robbery, making no effort to determine if a

14

crime had actually taken place or to do any forensic testing to try to identify or locate the perpetrators.

73.     Months later, when nothing had come of these initial attempts to frame Ms. Sumasar, and Ramrattan's rape trial was approaching, Ramrattan tried again. He contacted an acquaintance who also knew Ms. Sumasar, Neil Lutchman, and tried to induce him to call Queens police and falsely report that, while posing as a police officer, Ms. Sumasar had pulled him over and robbed him.  Lutchman refused.

### Misconduct by NYPD and NCPD Detectives Enables Ramrattan to Frame Ms. Sumasar in Nassau County

74.     Ramrattan eventually enlisted Terrell Lovell, an acquaintance of both his and Mohanlal, to participate in his scheme.  Lovell proved to be slightly more able than Mohanlal and Conde.  On March 2, 2010, Lovell called Nassau County police and falsely reported that he had been robbed by a woman and a black male in a Jeep Cherokee who were posing as police officers, with vests, badges and at least one brandished handgun.  Nassau County police, including defendants Detectives Lisa Charles and D. Carter Bershad, responded to the purported scene in Inwood.

75.     Although the detail was not included in the original police report, the final police report of the incident stated that Lovell alleged that his female assailant was a Guyanese Indian. Either Lovell did identify his assailant as a Guyanese Indian with a specificity that defied all reasonable likelihood of what anyone, let alone a crime victim in a high stress situation, might be able to determine and report; or Bershad and/or Charles later fabricated the description after deciding that Ms. Sumasar was a suspect, and then lied to prosecutors, defense counsel and the court consistent with that fabrication.

76.     Lovell also gave police a partial New York plate consistent with the plate of the

15

Jeep Cherokee that Ms. Sumasar sometimes drove and described the gold rims and partially

discolored patch on the driver's door of that vehicle.

77.     At the time of this made-up incident, Ms. Sumasar was asleep at home with her

daughter.

78.     Moreover, Ramrattan was as careless when coaching Lovell as he had been with

Mohanlal and Conde. Despite describing himself as a "big car buff" and very detail-oriented

with regard to vehicles, Lovell described the Jeep just as Mohanlal had, as charcoal gray, which

was not the color of Ms. Sumasar's Jeep.

79.     Lovell also described his assailant as 5'5", much taller than the 5'1" Ms. Sumasar.

80.     Notwithstanding the partial plate, Lovell's report was still insufficient to lead

police to as unlikely a suspect as Ms. Sumasar.

81.     Immediately after the alleged Lovell incident, NCPD defendants Charles and

Bershad began communicating with the Internal Affairs Division of the NYPD, including

defendants James Conlon and Marisa Valle, about this alleged robbery and police impersonation

and the strikingly similar alleged incidents in Queens.

82.     On information and belief, from this point forward, the NCPD and NYPD were

sharing information about the alleged robberies and subsequent investigations, and all of the

information available to one department was known or should have been known to members of

the other department.

83.     Two months later, on May 2, 2010, with Ramrattan's rape trial growing closer,

Ramrattan or someone working on his behalf called the Nassau County police to report another

fictional incident.

84.     The anonymous caller did not call 911, which would have recorded the call and

16

the phone number from which he was calling, but instead called the Fourth Precinct of the Nassau County Police Department – where defendant Charles and other Nassau County defendants work – directly. The routing of this anonymous call raised, or certainly should have raised, suspicion about the legitimacy of the complaint.

85.     The anonymous caller reported that a "possibly Spanish or Indian" female and a black male posing as police officers had attempted to rob him in the middle of the night at the Five Towns Shopping Center. The anonymous caller claimed that his assailants were traveling in a gold Jeep Cherokee, and also claimed to have recorded the full plate. This time the plate he gave police matched exactly that of the Jeep Cherokee that Ms. Sumasar was driving during that time period. Within a day, Nassau County police had traced the plate to its registered owner, Ms. Sumasar's sister in Florida. But they made no immediate move to arrest Ms. Sumasar's sister or Ms. Sumasar herself.

86.     The security guard on duty at the shopping center at the time of the alleged incident revealed to Charles that he had not observed any such incident. Similarly, on information and belief, security and traffic cameras that would have captured the incident or its aftermath, had it actually occurred, did not contain any evidence of any such incident.

87.     Ramrattan then induced yet another person to join his scheme to discredit Ms. Sumasar by jailing her for a nonexistent crime. This time he tapped Luz Johnson, a long-time family friend that he had known for years, and who had dated his brother. In the early hours of May 19, 2010, Johnson falsely reported to Nassau County police that she had been pulled over in Inwood by two men and one woman with bulletproof vests and police badges; that one of her assailants was a Hispanic or Indian woman who brandished a semiautomatic handgun; that her attackers stole $1400 in cash and some miscellaneous clothing from her; that one of the men

17

called the woman "Sim"; and that these persons were riding in a two-tone brown Jeep. The full license plate number Luz Johnson provided matched exactly that of the Jeep Ms. Sumasar was driving at the time.

88.     Ramrattan, however, failed to coach Johnson on Ms. Sumasar's basic physical description: Johnson, who was herself 5'5," described the 5'1" Ms. Sumasar as being 5'5" tall, which should have made it obvious that Johnson had never actually encountered Ms. Sumasar.

89.     Johnson's story was also highly suspect. First, she claimed to have seen and committed to memory a full license plate in the briefest of instants in low-light and under stressful conditions. Second, her claims of what was stolen were wholly unsubstantiated and implausible, including that she was carrying so much cash in an envelope, and that she was, in the middle of the night, coming from a shopping mall where she had purchased the clothing that was allegedly stolen from her. Third, her claims of what was taken swelled over time: initially she said the alleged perpetrators had taken only "miscellaneous" clothing from her trunk, but within a couple of days, began to claim that $600 worth of newly purchased designer jeans had been taken, along with some mail with her sister's address on it.

90.     Most strikingly, Johnson claimed that at the time of the alleged robbery she was on her way from the Corona neighborhood of Queens to her home in New Jersey; however, Inwood is located at the base of the Rockaway peninsula and there is no plausible route from Corona to New Jersey that would bring a driver through Inwood, especially in the middle of the night.

91.     In fact, Ms. Sumasar had an airtight alibi for the night of the alleged Johnson robbery: at the time of the alleged incident Ms. Sumasar was in Connecticut at the Mohegan Sun casino with her nephew and two friends. Casino security cameras recorded her presence there,

18

and mobile telephone towers recorded the fact that she made calls from there, including to Mr. McDonald, with whom their daughter was staying while Ms. Sumasar was out of town for the night.

92.     Two days later, Johnson again called the police, this time claiming that in the middle of the night, she stepped out of her New Jersey home and saw a man opening the door of her vehicle, which she had left unlocked. She alleged that she saw the man get into a black Nissan Maxima and gave a complete license plate number, one that matched exactly that of Mr. McDonald's black Nissan Maxima. On information and belief, Johnson called Detective Charles to report the alleged incident after reporting it to Englewood, New Jersey police.

93.     Even the most rudimentary investigation would have revealed that Johnson's New Jersey street is unlit, and that it would have been impossible for Johnson to read a license plate at night, as she claimed to have done. But defendants Bershad, Nill, Brady and Charles did no such investigation. Additionally, no effort was made to determine whether it was possible for the alarm on Johnson's car to be set off despite the car being unlocked, or to examine the car for fingerprints. Moreover, police knew or could easily have confirmed that Mr. McDonald's car did not pass through any of the toll plazas for the bridges and tunnels connecting Johnson's home in New Jersey to Mr. McDonald and Ms. Sumasar's homes in Queens.

94.     Instead, having been spoonfed license plate numbers leading them to Seemona Sumasar, Nassau County police defendants made her a suspect.

95.     Prior to Ms. Sumasar's arrest and since the first alleged Inwood incident, the Nassau County police defendants and the NYPD police defendants investigating the alleged Queens incidents were in contact with each other and sharing information, given the striking similarities in *modus operandi* and perpetrator and vehicle descriptions in the police

19

impersonation robberies alleged by Mohanlal, Conde, Lovell and Johnson.

**Despite Being on Notice about Ramrattan, Defendants Fail to Investigate His Connection to the Alleged Robberies and Instead Target Ms. Sumasar**

96.     Defendants Bershad, Nill, Brady and Charles ran Ms. Sumasar's criminal history and learned that she had had no prior contact with the criminal justice system. They also learned through records searches and discussion with the New York Police Department Special Victims Unit that she had reported being raped by Jerry Ramrattan, that his trial on that charge was impending, and that Ramrattan had a criminal record, including robbery and weapons convictions.

97.     Through their contact with other law enforcement agencies, including but not limited to the NYPD and the Nassau County District Attorney's Office, Bershad, Nill, Brady and Charles knew or should have known that Ramrattan's own modus operandi was masquerading as a police officer and framing others for nonexistent crimes.

98.     On information and belief, Bershad, Nill, Brady and Charles also learned from the NYPD defendants, including Conlon and Valle, that Ramrattan was an informant or cooperator with NYPD officers and/or precincts in Queens and/or elsewhere in New York City.

99.     On information and belief, all defendants agreed that they would conceal and protect Ramrattan's relationships with the NYPD, including by not investigating him for his potential role in a scheme against Ms. Sumasar, or by ignoring the positive results of any such investigation.

100.     The implausible and inconsistent robbery allegations in front of them combined with their information about Ramrattan, his proclivities and history, and the rape, made it obvious that Ramrattan had both the motive to try to frame Ms. Sumasar, and experience that would be useful in doing so.  This information alone should have put defendants Bershad, Nill,

Brady and Charles on notice that Ramrattan was likely behind the robbery allegations.

101. Nevertheless, they did not investigate Ramrattan and the obvious connections between him and the alleged victims, or further investigate whether Ms. Sumasar had committed the alleged crimes.

102. Indeed, they did not even attempt to determine whether the alleged incidents had ever occurred. Neither at that point nor at any other time did NCPD detectives, including defendants Charles, Bershad, Brady, Nill and Does, attempt to determine whether either alleged robbery had taken place. For instance, no effort was made to look into whether Lovell had ever in fact possessed the $1900 in cash and jewelry that he claimed had been stolen from him. Similarly, no one from NCPD ever asked Johnson why she had $1400 in cash on her or checked her bank records. They never asked for receipts or other proof that Johnson had purchased the clothing items she claimed had been stolen. Nor did they ever examine Johnson's car or possessions for forensic or fingerprint evidence.

103. Instead, defendants Charles, Bershad, Brady, Nill and Does determined to do whatever was necessary to see Ms. Sumasar arrested, indicted and convicted.

104. Defendants Bershad, Nill, Brady and Charles began by obtaining a photograph of Ms. Sumasar's from Department of Motor Vehicles records and using it to create photo arrays that they then showed to Lovell and Johnson.

105. That photograph was taken when Ms. Sumasar was sixteen, and did not accurately portray her actual appearance twenty years later.

106. On information and belief, Ramrattan had coached Lovell and Johnson on Ms. Sumasar's contemporary appearance, and not her appearance as a teenager.

107. However, the arrays created by the defendants were unduly suggestive, orienting

the viewer to Ms. Sumasar, whose photograph was on a very different background than the other five photographs in the arrays.

108.    The suggestive arrays helped Lovell and Johnson falsely identify Ms. Sumasar as the female who had robbed them, notwithstanding the age of the photograph and the differences between Ms. Sumasar's appearance as a teenager and her appearance in 2010, when she was in her mid-thirties.  Lovell in particular failed to identify Ms. Sumasar from a black and white array that did not show the different backgrounds, but successfully identified her once shown an array containing the same photos in full color, in which the  highly suggestive difference between the background on Ms. Sumasar's photograph and those of the other individuals was visible.

109.    The NCPD also conducted photo arrays for Lovell and Johnson that included photographs of various male family members, friends and other acquaintances of Ms. Sumasar, including Mr. McDonald, as a means of identifying the two men that purportedly participated in the alleged incidents.  No identifications were made.

110.    No reasonable officer would have believed that there was at this point probable cause to believe that Ms. Sumasar had robbed Lovell or Johnson.  Defendants Bershad, Brady, Charles, Nill and Does knew or should have known that Lovell and Johnsons' purported identifications at the photo arrays were unreliable.  Moreover, they knew or should have known that the alleged victims' claims were both preposterous and wholly unsubstantiated; that almost nothing had been done to determine whether the alleged crimes had actually occurred, and what evidence there was suggested that no crimes had actually taken place; that they had no information as to who, if Ms. Sumasar was the female in the alleged incidents, the men allegedly involved could have been; and that nothing whatsoever had been done to determine where Ms. Sumasar was at the times of the alleged incidents and whether she could possibly have been

22

involved.

## Defendants Arrest Ms. Sumasar Without Probable Cause

111.   Despite knowing that there was no probable cause to arrest Ms. Sumasar, Defendants Nill, Brady, Charles, and Bershad along with other officers, came from Nassau County to Queens on the evening of May 21, 2010 to arrest Ms. Sumasar with the knowledge and permission of the NYPD.

112.   Ms. Sumasar and her restaurant had been under surveillance by NCPD officers, including defendant Michael Knatz, since earlier in the day. Ms. Sumasar was driving Mr. McDonald's black Nissan Maxima that day. At approximately 6 p.m., Knatz was watching the restaurant.

113.   Knatz saw or should have seen Ms. Sumasar driving up to the restaurant with her twelve year-old daughter Chiara, and Chiara getting out and going into the restaurant.

114.   A moment after Seemona pulled up at the restaurant and Chiara got out, a restaurant employee came out with a bag of food that she gave to Ms. Sumasar. Ms. Sumasar then pulled away from the restaurant in the black Maxima, and Knatz followed. He called his colleagues, including defendant Charles.

115.   Ms. Sumasar was on the way to bring dinner to Mr. McDonald, who worked a few minutes away from the restaurant. Defendants Charles and Knatz and the other NCPD officers pulled her over just as she reached the school where Mr. McDonald worked. They made her get out of the car and cuffed her. They refused to tell her why she was being arrested or where they were taking her. When Mr. McDonald came out to find out what was going on, the officers misdirected him, and told him that they were taking Ms. Sumasar to the 105th Precinct in New York City.

116.    During her arrest, Ms. Sumasar was visibly frightened and crying.

117.    Within the hearing of all officers present, including defendants Charles and Knatz, she asked Mr. McDonald to go back to the restaurant and take care of their daughter, who was waiting for her there.

118.    Both Ms. Sumasar and Mr. McDonald were in every way compliant with the officers. Mr. McDonald even showed them how to start his car so that they could take it with them to search it.

### Defendants Interrogate Ms. Sumasar, Who Truthfully Maintains her Innocence

119.    Instead of taking Ms. Sumasar to the 105th Precinct, as they had told Mr. McDonald they would, defendants took her to the Nassau County Police Department's Fourth Precinct in the Eastern Meadows area of Nassau County, New York. At the precinct, they patted her down, vouchered her jewelry and phone, and then handcuffed her to Det. Charles's desk.

120.    Ms. Sumasar asked repeatedly for the opportunity to make a phone call so that she could speak to and reassure her twelve year-old daughter, and was repeatedly refused.

121.    Having isolated her from her family and friends, defendant Charles spent six or more hours interrogating Ms. Sumasar while defendant Brady took notes. Defendant Nill was also present for most of the interrogation.

122.    Ignoring the probability of her innocence and the most fundamental of interrogation policies, Charles, Brady and Nill failed to ask Ms. Sumasar about her whereabouts at the times of the alleged robberies, or even tell her the nights about which they were concerned. Because they did not tell her the nights about which they were concerned, Ms. Sumasar had no opportunity to inform them that she had an airtight alibi for at least one of the alleged incidents, the alleged robbery in the early hours of May 19, 2010, during which she was at Mohegan Sun.

24

123.    Brady, Charles and Nill later misrepresented to prosecutors and/or the grand jury that Ms. Sumasar had been given the opportunity to tell them about her whereabouts on the early hours of May 19 and had failed to mention her alibi. This misrepresentation suggested to prosecutors and the grand jury that the alibi was a latter-day fabrication by Ms. Sumasar.

124.    Instead of telling her why she was being interrogated, defendants sought to confuse and disorient Ms. Sumasar, falsely claiming that the Nissan Maxima in which she had been arrested had been involved in a high-speed chase the night before.

125.    At some point during the interrogation, additional folders were brought into the room and placed on Charles's desk. One of those folders was clearly marked with Jerry Ramrattan's name, and Ms. Sumasar glimpsed a photograph of him among the documents in the file.

126.    Upon information and belief, either this file included record of Ramrattan being a police informant or cooperator, or NYPD defendants Conlon, Valle and/or Does already had given Charles this information verbally.

127.    Once she saw the Ramrattan file, Ms. Sumasar realized he must be involved in her ordeal, and told defendants Brady, Charles and Nill all about him, including the rape, his pending trial, and his repeated threats and attempts to silence her from testifying against him. She told them about Ramrattan's penchant for posing as a police officer, and that the NYPD and the Queens District Attorney's office were investigating him for impersonating a police officer because of a photo she had given the office of Ramrattan in an NYPD uniform in connection with the rape prosecution. She gave them the names of the NYPD officer and the Queens prosecutor investigating and prosecuting the rape charge, and told them that the trial was upcoming. She also gave them permission to look through her mobile phone for the number for

25

Queens Assistant District Attorney who was prosecuting the rape.

128. Repeatedly, she told them that she was certain that Ramrattan must be behind whatever had brought her to the precinct and begged them to look into his involvement.

129. She also told defendants Brady, Nill and Charles that Ramrattan carried a gun and a badge. In response to a question, she told them that she may have seen a bulletproof vest in the trunk of Ramrattan's car. She was emphatic, however, that she had never possessed such items and that she had never allowed Ramrattan to bring them into her apartment.

130. Defendants completely ignored the evidence Ms. Sumasar presented – evidence of her innocence and of Ramrattan's scheme – and refused to investigate whether Ramrattan had concocted these crimes.

131. Instead, they twisted Ms. Sumasar's words, fabricating from her actual statements – that Ramrattan possessed a gun, badge and bulletproof vest that she had never allowed into her home – the false claim that Ms. Sumasar admitted to herself possessing a gun, badge and bulletproof vest. They later transmitted this fabrication to the Nassau County District Attorney's office, which repeated it at her bail hearing as a ground for denying her reasonable bail.

132. After approximately five hours of interrogation, defendant Charles finally told Ms. Sumasar that she was being questioned about a robbery. Charles showed her photos of Johnson's pocketbook and car, and insisted that she had participated in a robbery involving the pictured items. Ms. Sumasar truthfully denied any involvement in any robbery. Defendant Charles and Doe officers and supervisors told her she was in very serious trouble and pressured her to sign a statement admitting guilt, which she refused to do.

133. Ms. Sumasar's interrogation continued sporadically throughout the night. Her repeated requests to call her twelve year-old daughter were refused, as were her entreaties that

police investigate Ramrattan's role in setting her up.

### NYPD Detectives Interrogate Ms. Sumasar

134.    The next morning, NYPD defendants Det. Marisa Valle and two John Does showed up at the Nassau County police precinct to interrogate Ms. Sumasar, having already conspired with defendants Charles, Brady, Bershad, Nill  and Does to have Ms. Sumasar arrested despite a lack of probable cause.  She told them the same truth that she had told defendants Brady, Charles and Nill the night before: that she was completely innocent of any wrongdoing and that Jerry Ramrattan must be behind the false allegations against her.

135.    On information and belief, in addition to knowing Ramrattan's extensive history of criminal activities, these NYPD defendants were aware that Ramrattan was an informant or cooperator for NYPD officers and/or precincts and had personal and professional relationships with numerous NYPD officers.

136.    On information and belief, because of the formal and/or informal relationships between Ramrattan and NYPD officers and/or precincts, all the NYPD defendants ignored the evidence Ms. Sumasar put in front of them and refused to investigate her readily verifiable claims of innocence, including but not limited to the many and obvious connections between Ramrattan and her accusers. Instead, they failed to disclose those relationships and covered up and facilitated Ramrattan's crimes and misconduct, including but not limited to his crimes against Ms. Sumasar and his prior acts of misrepresenting himself as a police officer.

137.    On information and belief, the NYPD defendants conspired with the NCPD defendants to do the same.

### Investigators Interrogate Mr. McDonald and Ms. Sumasar's Nephew, Who Confirm Ms. Sumasar's Innocence and Implicate Ramrattan

138.    Because of the incorrect information given to him by the NCPD at the scene of

27

the arrest, Mr. McDonald spent hours searching for Ms. Sumasar at NYPD precincts the night of her arrest. By the next morning he finally discovered that she was being held in Nassau County. He arrived at the Nassau County Police Department's Precinct along with Ms. Sumasar's nephew, Avinash Buhidat.

139.    Mr. McDonald and Mr. Buhidat were denied access to Ms. Sumasar and instead were themselves interrogated separately by members of both the NCPD and the NYPD.    Mr. McDonald was interrogated by four unknown officers; on information and belief, two of the officers were from the NCPD; two were from the NYPD; and one of the two officers from the NYPD was defendant Valle. Mr. Buhidat was interrogated by Charles and other unknown officers.

140.    Both Mr. McDonald and Mr. Buhidat rapidly came to the same conclusion that Ms. Sumasar had arrived at independently – that Jerry Ramrattan must be behind the charges – and so told their interrogating officers about Ramrattan and their certainty that he was framing Ms. Sumasar.

141.    The officers interrogating Mr. Buhidat, including defendant Charles, falsely told him that Ms. Sumasar had confessed and implicated him. He truthfully denied any involvement in the alleged robberies and was released without being arrested.

142.    When, during his interrogation at the Nassau County Fourth Precinct, Mr. McDonald insisted that Jerry Ramrattan must be framing Ms. Sumasar, a female detective indicated that she knew Ramrattan and Ramrattan was not involved. On information and belief this detective was NYPD defendant Valle.

143.    Nassau County police defendants Nill and Charles also obtained Mr. McDonald's permission to search his vehicle, the black Maxima that was purportedly involved in three of the

28

alleged incidents, including the most recent incident. No trace of anything associated with any of the alleged incidents was found in the vehicle, including no gun, no vest and no police paraphernalia.

### NCPD Defendants Charge Seemona Sumasar Despite an Utter Lack of Probable Cause

144.    Defendants Charles, Nill and Brady failed to obtain a confession from Ms. Sumasar, and knew or should have known about Ramrattan and his likely involvement. Moreover, they and other defendants failed utterly to investigate Ms. Sumasar's easily-verifiable claims of innocence, including by making no effort to uncover the many obvious connections between Ramrattan and Lovell and Johnson or determine whether any of the alleged armed robberies had actually occurred.

145.    Defendants also knew or should have known that the accounts given by the alleged victims were replete with inaccuracies, inconsistencies and highly implausible details that made it highly likely that these accounts were false, including, for example:

a.    Johnson, who is herself 5'5," described the 5'1" Ms. Sumasar as being 5'5" tall;

b.    The vivid descriptions of the Jeep Cherokee, almost all of which involved partial or complete license plate numbers matching Ms. Sumasar's sister's Jeep, varied wildly when it came to color, from gold to charcoal gray to metallic blue, whereas the Jeep Ms. Sumasar drove was actually tan; and

c.    Johnson claimed to have twice seen and obtained full license plates in brief, high stress nighttime situations with low light.

d.    Johnson changed her initial story that the perpetrators had only taken miscellaneous clothing from her trunk to a claim that they had taken $600

29

of designer clothing as well as some mail, in one preposterous stroke

inflating her claims of loss and providing an explanation for her facially

implausible story that the perpetrators had tracked her to her sister's New

Jersey home;

e.     Johnson claimed that the alarm went off when the door of her unlocked

car was opened;

f.     Johnson claimed that at the time of the alleged robbery she was on her

way from the Corona neighborhood of Queens to her home in New Jersey

despite there being no plausible route from Corona to New Jersey that

would bring a driver through Inwood, which is located at the head of the

Rockaway peninsula.

146.    Additionally, defendants knew that Ms. Sumasar had no prior criminal record, and

failed to develop any reliable corroboration for the complainants' allegations, including but not

limited to:

a.     There was no evidence that any of the alleged victims was actually

deprived of any possessions;

b.     No fingerprint or forensic evidence was identified on any of the objects

with which the complainants alleged Ms. Sumasar had contact;

c.     Neither surveillance and traffic cameras nor a security guard present

around the scenes of the alleged incidents had captured or seen anything;

d.     There was no record of Mr. McDonald's car crossing between New York

and New Jersey; and

e.     Searches of the two vehicles implicated in the alleged incidents revealed

no evidence whatsoever of any of the alleged crimes.

    f.    Moreover, as demonstrated by their failure to arrest Mr. McDonald, they knew that Mr. McDonald had no connection to the alleged incidents and could not substantiate a theory that another man had used his car to commit them.

147.    They nonetheless chose to charge Ms. Sumasar with eight separate felonies.

148.    None of the eight felonies she was charged with had actually ever occurred. She was absolutely innocent.

### Defendants Bershad, Brady, Charles and Nill Lie to Prosecutors

149.    In order to ensure Ms. Sumasar's indictment and eventual conviction, and on information and belief, because of Ramrattan's relationships with the NYPD and in furtherance of their conspiracy with NYPD defendants to ignore, cover up and facilitate Ramrattan's crimes and misconduct, including but not limited to his crimes against Ms. Sumasar, defendants Brady, Charles and Nill fabricated inculpatory statements that they attributed to Ms. Sumasar.

150.    First, one or more of them falsely told prosecutors that Ms. Sumasar had admitted to possessing a gun, badge, and bulletproof vest. Prosecutors repeated this lie at a bail hearing as a ground to deny Ms. Sumasar reasonable bail. As a result of that lie, her bail was set well beyond her means at $1,000,000 and she was unable to attain release on bail.

151.    Second, Charles and Brady falsely told prosecutors that Ms. Sumasar had revealed a motive for the alleged robberies by telling them that her business was not doing well and she was having financial problems. In fact, Ms. Sumasar never told defendants that her business was not doing well and she was having financial problems.

152.    In testimony as the primary complaining witness before the grand jury, Charles

repeated this lie, causing Ms. Sumasar's indictment and continued unjust confinement.

153. Third, Brady, Charles and/or Nill attempted to cast doubt on Ms. Sumasar's airtight alibi by misrepresenting to prosecutors and the grand jury that Ms. Sumasar had been given the opportunity to tell them about her whereabouts on the early hours of May 19 and had not mentioned that she was at Mohegan Sun.

154. Fourth, Bershad and Charles misrepresented to prosecutors that Lovell had volunteered that his female assailant was a Guyanese Indian. On information and belief, this was a fabrication by Charles and/or Bershad added to the police report after the fact to increase Ms. Sumasar's appearance of guilt.

155. Fifth, Charles told prosecutors and then the grand jury that during her interrogation, Ms. Sumasar seemed unconcerned about her daughter. In fact, Charles had seen Ms. Sumasar frantically instructing Mr. McDonald to go find their daughter at the time of her arrest, and begging him not to tell Chiara that she had been arrested, so that Chiara would not worry. Throughout the many hours of her interrogation, Ms. Sumasar repeatedly asked Charles directly and other members of the NCPD to allow her to make a phone call so that she could reassure her daughter. Charles's lie falsely portrayed Ms. Sumasar as unloving and inhuman and helped cause Ms. Sumasar's indictment and continued confinement.

156. Sixth, defendants Charles, Brady, Nill and John/Jane Does falsely told prosecutors that there was no connection between the alleged victims in the fictional robberies, and impliedly, that they had looked into whether such connections existed. In fact, Ramrattan had extensive ties to each of the alleged victims, and at least two of the alleged victims, Mohanlal and Lovell, had direct ties to each other. Defendants had made no attempt to uncover whether connections existed among the alleged victims and Ramrattan; instead, they refused to

check Ms. Sumasar's readily verifiable protestations of innocence, ignoring the evidence of Ramrattan's involvement that was in their hands and the further evidence provided by Ms. Sumasar, Mr. Buhidat, and Mr. McDonald.

157.    Had they made even a rudimentary investigation based on the facts in their possession, they would have determined that each of the alleged victims had had extensive contact with Ramrattan, including by phone, prior to, during and after the alleged incidents, and that Ramrattan himself had a history of impersonating police and framing innocents for his own purposes.

158.    Seventh, defendant Nill falsely told prosecutors and then testified in court that Johnson had stated that during the alleged, fictional robbery, she heard Ms. Sumasar refer to one of the men with her as "Elvis." Elvis is the nickname of Vishwanaut Bandhu, one of Ms. Sumasar's friends who was also a previous owner of the Jeep Cherokee that Ramrattan and his accomplices tried to implicate in the robberies. In fact, Johnson never gave police the name Elvis. Nill simply elaborated on Johnson's already fictitious allegations in order to increase Ms. Sumasar's appearance of guilt.

159.    Charles also made up additional lies to attempt to make the evidence against Ms. Sumasar appearance more incriminating. For instance, to account for the inconsistent reports about the color of the Jeep Cherokee used in the alleged robberies – Johnson described it as brown, the anonymous caller said it was gold, Lovell and Mohanlal said it was charcoal gray, Conde said it was blue and the vehicle report Charles obtained from the DMV described the vehicle operated by Ms. Sumasar as tan – Charles falsely reported to the prosecutor and later testified that the Jeep, was a "unique" and "unusual" color that could be perceived as a variety of different colors, depending on the light.

160.    Charles made these statements despite the true and ordinary tan color of the vehicle and despite never having never seen the Jeep and having no basis to describe its color as unique or possessing chameleon-like qualities.

161.    Similarly, Defendants Charles and Brady falsely told prosecutors and the court that Ms. Sumasar's interrogation lasted a "couple" of hours, when in fact she was interrogated from 7 p.m. on March 21, 2010 until the early morning hours of March 22, 2010, well over five hours. The exact timing of the interrogation is not known because Charles, Brady and Nill failed to follow their training and record the beginning and ending times of the interrogation.

### Even after Additional Evidence Comes to Light, NYPD and NCPD Defendants Fail to Investigate Ms. Sumasar's Obvious Innocence

162.    By mid-June 2010, after Ms. Sumasar had been in pretrial custody for almost a month, both the NCPD and NYPD defendants had received or were aware of photographs showing Ms. Sumasar at the roulette tables of the Mohegan Sun Casino in Connecticut at the time of the alleged May 19, 2010 robbery of Luz Johnson, as well as records from the telephone company confirming that she had made mobile phone calls at around that time from the vicinity of the casino to Mr. McDonald in Brooklyn.

163.    This timestamped contemporaneous evidence dispositively proved that Seemona Sumasar was not robbing Luz Johnson of designer clothing or $1400 in cash in Inwood in the early morning hours of May 19, 2010.

164.    Around the same time, an informer called an NYPD tipline to report that she had overheard Ramrattan discussing the plot with Johnson; on information and belief, this tip was passed to the NYPD and NCPD defendants.

165.    All defendants already knew or should have known about Ramrattan, the rape and the rape prosecution, Ramrattan's threats to Ms. Sumasar and Ramrattan's criminal history,

34

including his penchant for posing as a police officer, framing others for personal benefit and his prior success at getting rape accusers to back down through pressure and intimidation. They also knew or should have known about the inaccuracies, inconsistencies and highly implausible details in the alleged victims statements, as well as being aware of their own recklessly deficient investigation, failure to divulge the NYPD's relationships with Ramrattan, lies and other misconduct.

166.    Defendants ignored the facts in front of them and steadfastly refused to investigate Ms. Sumasar's readily verifiable claims of innocence, for instance by seeking additional photographs or questioning members of the security staff and other employees at Mohegan Sun to verify that Ms. Sumasar was there at the time of the alleged Johnson robbery, or by investigating the barely concealed connection between Ramrattan and Ms. Sumasar's accusers once Ms. Sumasar, Mr. McDonald and her nephew urged them to do so.

167.    In the alternative, and on information and belief, the NYPD and/or NCPD defendants did investigate and verify Ms. Sumasar's innocence but buried what they found from prosecutors and defense counsel in order to protect Ramrattan and his connections to the NYPD and NYPD investigations.

168.    Moreover, just as the NCPD defendants failed to investigate whether the Lovell and Johnson incidents actually occurred, NYPD Detective James Conlon, Marisa Valle and the John and Jane Doe NYPD Detectives assigned to the case made no effort to determine whether the alleged Mohanlal and Conde robberies had actually taken place, and additionally on information and belief, either no effort was made to test the handcuffs and bullet casing recovered from the scene of the alleged Mohanlal robbery for fingerprints or forensic evidence, or any effort that was made was not reported because the testing led back to Ramrattan, whose

35

fingerprints were on file because he was a convicted felon, and not to Ms. Sumasar.

169. On information and belief, NYPD Detective James Conlon, Marisa Valle and the John and Jane Doe Detectives also knew or should have known that the alleged victim in the September 17, 2009 incident, Christopher Conde had misstated Ms. Sumasar's ethnicity and had also given two very different descriptions of the color of the Jeep, both wrong, suggesting that he had never seen either her or the vehicle. Moreover, after making the initial call to police, Conde, realizing that his claims were baseless, evaded police inquiries about the alleged incident and all attempts to get him to participate in an investigation. Defendants knew or should have known that the alleged Conde incident was so similar to the alleged Mohanlal incident that if Conde's report was unreliable, Mohanlal's report was necessarily suspect as well.

170. Additionally, in October 2010, Neil Lutchman told members of the NYPD that the accusations by Mohanlal against Ms. Sumasar were part of a plot by Ramrattan to frame Ms. Sumasar, and that Mr. Lutchman had been approached by Ramrattan to participate in the plot.

171. Instead of acting upon Mr. Lutchman's information, and investigating the connection between Ramrattan and Mohanlal, the NYPD defendants arrested Mr. Lutchman and charged him for interfering with Mohanlal as a witness in the case against Ms. Sumasar.

172. The NYPD, as the entity responsible for investigating Ramrattan's rape and false imprisonment of Ms. Sumasar, had a particular duty to act reasonably and ensure that nothing that they did harmed her as a prosecution witness, and not to expose her to retaliation and other dangers associated with her cooperation with the prosecution.

173. With willful indifference to this duty, ignoring the facts in front of them raising grave doubt about whether these crimes ever occurred, and without investigating Ms. Sumasar's readily verifiable claims of innocence or the corroborating information from Mr. Lutchman, in

November 2010, the NYPD defendants charged Ms. Sumasar and caused the Queens District Attorney to seek and obtain an indictment from a Queens grand jury for four felony counts for the alleged Mohanlal incident, including robbery in the first degree, robbery in the second degree, criminal impersonation in the first degree and menacing in the second degree.

174.    On information and belief, NYPD defendants misled the grand jury by failing to disclose any of the following: the connections between the NYPD and Ramrattan; Conde's inconsistent reporting and evasiveness, Mr. Lutchman's allegations that Jerry Ramrattan had solicited him to frame Ms. Sumasar for the same crime Mohanlal was accusing her of committing, or the fact that Ramrattan had a motive to discredit Ms. Sumasar because he was about to stand trial for raping her. They further misled the grand jury by falsely stating that there was no connection between Mohanlal and Ramrattan.

175.    Ms. Sumasar was indicted in Queens on November 8, 2010.

## Ms. Sumasar Spends More Than Six Months in Jail Before Finally Being Vindicated

176.    Under mounting defense pressure and only after Ms. Sumasar had been in jail for more than six months, the NCPD finally deigned to look into the connection between Ramrattan and her accusers. When it did so, it readily and immediately discovered evidence of the conspiracy sufficient to free Ms. Sumasar and charge Ramrattan, Lovell and Johnson with perjury.

177.    Ms. Sumasar was finally released from jail on December 2, 2010, six months and eleven days after being taken into custody.

178.    Her Nassau county indictment was dismissed on January 11, 2011.

179.    Her Queens indictment against was finally dismissed on February 10, 2011.

180.    Ramrattan and three of his coconspirators were arrested, charged and indicted for

their roles in framing Ms. Sumasar. Lovell, Johnson and Mohanlal pleaded guilty to perjury charges. Ramrattan was tried in Queens and on November 23, 2011, a Queens jury found Ramrattan guilty on all 11 counts of his indictment, which covered both the rape and the framing conspiracy.

## Chiara McDonald

181.   During the more than six months that Ms. Sumasar was in jail, her daughter Chiara McDonald suffered the loss of her primary caregiver and the loss of the close and loving relationship she has with her mother. She also experienced the mortification of seeing her mother arraigned and thrown in jail, and the humiliation of having these events widely broadcast in the media. Her schoolwork and personal relationships suffered.

182.   While Ms. Sumasar was in jail, she tried to limit Chiara's exposure to her ordeal by having Chiara visit only rarely. The separation was wrenching for both of them, but Chiara seeing her mother in jail on her rare visits was traumatic for both Chiara and Ms. Sumasar.

183.   Additionally, because of Ms. Sumasar's absence and the stress that her unjust jailing placed on the rest of the family, Chiara was forced to fill out her high school placement forms without help, and as a result received an unfavorable placement that cannot now be changed.

## Damages

184.   The actions of all the individual defendants, acting within the scope of their employment with the City of New York and Nassau County, deprived Plaintiff Seemona Sumasar of her rights under the First, Fourth and Fourteenth Amendments of the United States Constitution and the laws of New York and deprived Chiara McDonald of her rights under the First and Fourteenth Amendments of the United States Constitution and the laws of New York.

185. As a direct and foreseeable result of defendants' misconduct Ms. Sumasar was incarcerated for more than six months for crimes she did not commit and wrenched from her twelve year-old daughter Chiara, of whom she had primary custody.

186. The negligent, unlawful, intentional, willful, deliberately indifferent, reckless and/or bad faith acts and omissions of defendants caused Seemona Sumasar the following damages, which continue to date and will continue into the future: personal injuries; pain and suffering; loss of liberty; severe mental and emotional injury and anguish; loss of family relationships, including with her young daughter; severe psychological damage; damage to her business and property, including but not limited to the loss of her Golden Krust Restaurant franchise and all the resources that were put into obtaining the restaurant and building the business, fees and penalties associated with the loss of the restaurant, future lost income from that business, and the foreclosure of her home; medical and legal expenses; loss of income and earning capacity; infliction of physical injury and physical sickness, including but not limited to extreme stress and resulting blood pressure disorder; humiliation, indignities and embarrassment; degradation; fear; loss of standing in the community; permanent loss of natural psychological and social development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunities, vocational opportunities, personal fulfillment, voluntary sexual activity, family relationships, reading, television, movies, travel, enjoyment and expression, for which she is entitled to monetary relief.

187. Those same actions and omissions by defendants caused Chiara McDonald to experience a loss of her relationship with her mother at a crucial and tender age, including the financial and other support, nurture, love, guidance, and training that her mother would have provided her with during that time; loss of educational opportunity; severe psychological

39

damage; infliction of physical injury and physical sickness, including but not limited to extreme stress; humiliation, indignities and embarrassment; degradation; fear; loss of standing in the community; and permanent loss of natural psychological and social development.

188.     The non-negligent acts and omissions committed by the defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages, except as to the claims against the City of New York, and Nassau County.

## FEDERAL CLAIMS
### COUNT I
### 42 U.S.C. § 1983 Fourth Amendment Claim

189.     Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

190.     NCPD defendants Bershad, Brady, Nill, Charles, Knatz and Doe officers and supervisors, with malice and knowing that probable cause did not exist to arrest Ms. Sumasar or to prosecute her for first-degree robbery, first-degree criminal impersonation, unlawful wearing of a body vest or any other crimes, acting individually and in concert, caused Ms. Sumasar to be arrested, charged, and prosecuted for those and other crimes in Nassau County, thereby violating Ms. Sumasar's clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures, false arrest and malicious prosecution.

191.     NYPD Defendants Conlon, Valle, and Doe officers and supervisors with malice and knowing that probable cause did not exist to arrest Ms. Sumasar or prosecute her for first-degree robbery, first-degree criminal impersonation, menacing or any other crimes, acting

individually and in concert, caused Ms. Sumasar to be charged, and prosecuted for that crime in Queens County, thereby violating Ms. Sumasar's clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures, false arrest and malicious prosecution

192.    The defendant officers, acting individually and in concert, intentionally and knowingly deliberately misrepresented the truth and withheld exculpatory facts from prosecutors and/or the grand jury that vitiated probable cause against Ms. Sumasar. Specifically, defendants fabricated admissions from Ms. Sumasar that she owned a bulletproof vest and other police paraphernalia and had financial trouble because her business was failing, and withheld material exculpatory and impeachment information including but not limited to information regarding Jerry Ramarattan, his history and his relationships with the NYPD and/or other law enforcement; the fact that they either did not investigate the connections among the alleged victims and between the alleged victims and Ramrattan, or that they investigated and discovered those connections; the fact that they had fabricated admissions; that her identification by the alleged victims came only after a highly suggestive photo array; and that Ms. Sumasar had absolutely no motive or opportunity to engage in the crimes alleged.

193.    Defendants initiated and continued the prosecution against Ms. Sumasar without probable cause, in violation of Ms. Sumasar's clearly established constitutional rights. No reasonable officer in 2010 would have believed this conduct was lawful.

194.    Additionally, defendants Conlon, Valle, Bershad, Brady, Charles, Knatz, Nill, and the NYPD and NCPD John and Jane Doe officers and supervisors, acting individually and in concert, ignored the facts in front of them and failed to investigate Ms. Sumasar's readily verifiable claims of innocence, thereby depriving her of her clearly established constitutional

41

rights under the Fourth and Fourteenth Amendment of the United States Constitution, including but not limited to her right not to be subject to unreasonable seizure.

195.    As described above, despite copious evidence suggesting Ms. Sumasar's innocence, and notice and/or knowledge of Ramrattan, his incentives for framing Ms. Sumasar, and his prior criminal activity, including robbery, impersonation of a police officer, harassment and framing, defendants refused to make even a rudimentary investigation of Ms. Sumasar's readily verifiable claim of innocence; instead misrepresenting, in addition to the other fabrications outlined above, to the court and the grand jury that such an investigation had occurred and been fruitless. When defendants finally deigned to investigate, they immediately and readily uncovered convincing and substantial evidence of her innocence and the connections between the alleged victims and Ramrattan.

196.    The defendant officers performed the above-described acts under color of state law, deliberately, intentionally, with malice or reckless disregard for the truth and Ms. Sumasar's rights; in violation of their obvious and basic duties to protect Ms. Sumasar as a crime victim cooperating in the prosecution of her attacker; and with deliberate indifference to Ms. Sumasar's clearly established constitutional rights.  No reasonable officer in 2010 would have believed this conduct was lawful.

197.    Ms. Sumasar's Nassau County prosecution terminated in her favor on January 11, 2011, when her indictment was dismissed.

198.    Ms. Sumasar's Queens County prosecution terminated in her favor on February 10, 2011, when her indictment was dismissed.

199.    As a direct and proximate result of defendants' conduct, Ms. Sumasar was wrongly and maliciously prosecuted, denied bail and suffered a prolonged detention during the

more than six months that she was jailed, from May 21, 2010 until December 2, 2010, as well as the other grievous and continuing damages and injuries set forth above.

**COUNT II**

**42 U.S.C. § 1983 Fourteenth Amendment Claim**

200.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

201.    Defendants Brady, Nill, Charles, Knatz and John and Jane Does, acting individually and in concert, deliberately fabricated inculpatory evidence against Ms. Sumasar, thereby depriving her of her clearly established constitutional rights under the Fourteenth Amendment of the United States Constitution, including but not limited to her right not to be deprived of liberty as a result of the fabrication of evidence by a government investigator, and her right not to be deprived of liberty without due process of law, and substantive due process.

202.    Defendants Brady, Nill, Charles, Knatz and John and Jane Does deliberately fabricated evidence, including but not limited to the following: by claiming that Ms. Sumasar had told them that she possessed a gun, badge and bullet proof vest; that she had said that her business was not doing well and that she was having financial troubles, which suggested a motive for the alleged crimes; by falsely saying that one of the alleged victims had heard the woman who allegedly robbed her call one of the other assailants by the name of one of Ms. Sumasar's friends; by falsely claiming that Ms. Sumasar seemed unconcerned about her daughter throughout her interrogation and by falsely claiming that there was no connection between the alleged victims or between the alleged victims and Ramrattan.

203.    Defendants' fabrications and material omissions of exculpatory facts about the innocent Seemona Sumasar, combined with their refusal to investigate, or perhaps their

43

deliberate coverup of, Jerry Ramrattan's involvement, shock the conscience.

204.    By their conduct and under color of state law, NYPD defendants Conlon, Valle and Doe officers and supervisors and NCPD defendants Bershand, Brady, Charles, Knatz, Nill and Does officers and supervisors had opportunities to intercede on behalf of Ms. Sumasar and her daughter, Chiara McDonald to prevent Ms. Sumasar's false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, and to prevent Ms. Sumasar and Ms. McDonald from being separated, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so. The defendant officers' failures to intercede violated Ms. Sumasar and Ms. McDonald's clearly established constitutional rights, including but not limited to not to be deprived of liberty without due process of law as guaranteed by the Fourteenth Amendment.

205.    Defendants committed these acts under color of state law, intentionally, with reckless disregard for the truth and with deliberate indifference to Ms. Sumasar and Ms. McDonald's clearly established constitutional rights. No reasonable officer in 2010 would have believed this conduct was lawful.

206.    As a direct and proximate result of defendants' actions Mr. Sumasar was wrongly prosecuted, denied reasonable bail, jailed for more than six months and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT III

### 42 U.S.C. § 1983 First and Fourteenth Amendment Claim for Interference with Family Relationships

207.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

208.    NYPD defendants Conlon, Valle and Does officers and supervisors, and NCPD

defendants Bershad, Brady, Charles, Knatz, Nill and Doe officers and supervisors knew that Ms. Sumasar had primary custody of her twelve year-old daughter, both through Ms. Sumasar's statements and those of Mr. McDonald and by their observation of Ms. Sumasar with Chiara directly prior to her arrest.

209.    During the six months that Ms. Sumasar was wrongfully jailed, Chiara suffered the loss of her primary caregiver and of the close and loving relationship she has with her mother, as well as experiencing the mortification of seeing her mother arraigned and thrown in jail, and the humiliation of having these events widely broadcast in the media. Her schoolwork, educational opportunities and personal relationships suffered irreversible detriments.

210.    At the same time Ms. Sumasar suffered separation from her daughter and the terrible knowledge that her daughter was experiencing the harms just described.

211.    NYPD defendants Conlon, Valle and Does officers and supervisors, and NCPD defendants Bershad, Brady, Charles, Knatz, Nill and Doe officers and supervisors acting individually and in concert, by their conduct, including but not limited to fabricating evidence and/or refusing to investigate Ms. Sumasar's readily verifiable claims of innocence, as previously described, deprived Ms. Sumasar and Chiara McDonald of their clearly established constitutional rights under the First and Fourteenth Amendment of the United States Constitution, including but not limited to the rights to family association; for a mother to live with her daughter andto participate in her daughter's education, nurturing and development; and to protect and care for her daughter, and Chiara's right to the love, care, guidance, support and nurturing of her mother.

212.    Most egregiously, Charles falsely told prosecutors and the grand jury that Ms. Sumasar appeared not to care about her daughter, despite hearing Ms. Sumasar at the time of her

arrest beg Mr. McDonald to go to the restaurant and pick up Chiara and Ms. Sumasar's repeated pleas for an opportunity to call her daughter during her interrogation. The other defendants knew Charles's statements to be untrue, but concealed the truth from prosecutors and/or the grand jury.

213.    Defendants committed these acts under color of state law, intentionally, with reckless disregard and/or deliberate indifference to Ms. Sumasar's innocence, Ms. Sumasar's and Chiara's close relationship and clearly established constitutional rights, and with full knowledge that their actions would interfere with the relationship between Ms. Sumasar and her daughter. No reasonable officer or prosecutor in 2010 would have believed this conduct was lawful.

214.    As a direct and proximate result of defendants' actions Mr. Sumasar was wrongly prosecuted, denied reasonable bail, and jailed for more than six months, during which time she was removed from her daughter's life and during which time her daughter's education and other rearing and nurturing suffered because of Ms. Sumasar's absence, as well as the other grievous and continuing damages and injuries set forth above.

## COUNT IV

### 42 U.S.C. § 1983 Civil Rights Conspiracy

215.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

216.    NYPD defendants Conlon, Valle and Does officers and supervisors, and NCPD defendants Bershad, Brady, Charles, Knatz, Nill and Doe officers and supervisors, acting within the scope of their employment and under color of state law, agreed among themselves and with others to act in concert in order to deprive Ms. Sumasar of her clearly established First, Fourth and Fourteenth Amendment rights to be free from unreasonable seizures, false arrest, malicious

46

prosecution, fabrication of evidence, interference with her familial relationships; and her Fourth Amendment right to have her readily verifiable claims of innocence adequately investigated; and to deprive Chiara McDonald of her clearly established right to be free of interference with her relationship with her mother.

217.    In furtherance of the conspiracy each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.    Defendants Bershad, Charles, Nill, and Brady deliberately fabricated inculpatory evidence, as described above;

b.    All defendants repeatedly and willfully refused to investigate Ms. Sumasar's readily verifiable claims of innocence, despite the ample evidence of her likely innocence and the plausibility of her claims alleged above;

c.    Starting from the time of the alleged Lovell incident in early March 2010, all defendants were actively sharing information about the alleged robberies and subsequent investigations, and all of the information available to NYPD defendants was available to the NCPD defendants, and vice versa;

d.    All defendants, and particularly the NYPD defendants, concealed the relationships between Ramrattan and NYPD officers and/or precincts;

e.    Defendants Bershad, Charles and Nill deliberately provided perjured testimony in the grand jury and/or pretrial hearings, consistent with their out-of-court misrepresentations in documents and other official communications.

218.    As a direct and proximate result of defendants' actions Ms. Sumasar was wrongly convicted and imprisoned for more than six months in jail and suffered the other grievous and continuing damages and injuries set forth above.

## STATE LAW CLAIMS

### COUNT V

### False Arrest and Malicious Prosecution

219.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

220.   Defendants Conlon, Valle, and Doe officers and supervisors, with malice and knowing that probable cause did not exist to arrest Ms. Sumasar and prosecute her for first-degree robbery, first-degree criminal impersonation, menacing or any other crimes, acting individually and in concert caused Ms. Sumasar to be arrested, charged, and prosecuted for those and other crimes in New York City and Nassau County, in violation of the laws of New York.

221.   Defendants Bershad, Brady, Nill, Charles, Knatz and Doe officers and supervisors with malice and knowing that probable cause did not exist to arrest Ms. Sumasar and prosecute her for first-degree robbery, first-degree criminal impersonation, unlawful wearing of body vest or any other crimes acting individually and in concert, caused Ms. Sumasar to be arrested, charged, prosecuted and jailed for those and other crimes in New York City and Nassau County, in violation of the laws of New York.

222.   Specifically, the defendant officers, acting individually and in concert, intentionally and knowingly arrested Ms. Sumasar knowing that they had no probable cause to do so; and deliberately misrepresented the truth and withheld exculpatory facts from prosecutors and/or the grand jury that vitiated probable cause against Ms. Sumasar.

223.   Defendants engaged in these acts within the scope of their employment and are entitled to indemnification pursuant to Gen. Mun. Law §§ 50-j, 50-k and 50-l and by contract.

224.   Ms. Sumasar's Queens County prosecution terminated in her favor on January 11,

2011, when her indictment was dismissed.

225. Ms. Sumasar's Nassau County prosecution terminated in her favor on February 10, 2011, when her indictment was dismissed.

226. As a direct and proximate result of defendants' conduct, Ms. Sumasar was maliciously prosecuted, and jailed for more than six months, from May 21, 2010 until December 2, 2010, and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VI

### Intentional, Reckless or Negligent Infliction of Emotional Distress on Seemona Sumasar and Chiara McDonald

227. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

228. The improper, deliberate and traumatizing conduct of all defendants in fabricating evidence, concealing information about Ramrattan and/or refusing to investigate Ms. Sumasar's readily verifiable claims of innocence, resulting in her wrongful arrest and prosecution, and concomitant severe emotional distress, was extreme and outrageous, especially in light of their knowledge that she was a rape victim and her truthful claim that her rapist was behind the allegations against her. It directly and proximately caused Seemona Sumasar and Chiara McDonald to suffer the grievous and continuing injuries and damages set forth above.

229. In the alternative, all defendants negligently and grossly negligently, and in breach of their duties owed to Ms. Sumasar to, *inter alia*, report accurately the information given to them and her own statements and the circumstances underlying such statements; report accurately the information taken from other witnesses and their investigative responses to such information; protect her right as a crime victim seeking to testify against her attacker; and investigate her readily verifiable claims of innocence, and otherwise acting to deny Ms. Sumasar

49

due process of law, directly and proximately caused Ms. Sumasar, an innocent woman, to be falsely arrested, maliciously prosecuted, and wrongly jailed for more than six months, and to lose her livelihood and see her home go into foreclosure. Defendants' actions unreasonably endangered Ms. Sumasar's physical health and safety, and caused her to suffer physical harm, including physical ailments resulting from the circumstances and duration of her wrongful jailing, and to fear for her physical safety throughout the period of her detention. Defendants further inflicted emotional distress on Ms. Sumasar and her 12 year-old daughter Chiara by unlawfully depriving them of the mother-daughter relationship for six months, with all the previously identified injuries attendant thereto.

230. Defendants engaged in these acts within the scope of their employment and are entitled to indemnification pursuant to Gen. Mun. Law §§ 50-j, 50-k and 50-l and by contract.

## COUNT VII

### Negligence

231. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

232. All defendants are liable for negligence, having breached their duty of reasonable care to Ms. Sumasar, an innocent woman and rape victim seeking to testify against her attacker.

233. Specifically, without limitation and by way of example, defendants:

    a. despite their notice and knowledge, as outlined above, failed to investigate Ms. Sumasar's innocence and the connection between her false accusers and Ramrattan; and

    b. failed to report accurately their investigation, including Ms. Sumasar's interrogation, her statements during that interrogation, and their failure to

investigate her innocence and/or Ramrattan and his connections to her false accusers.

234.    Defendants' negligence and gross negligence directly and proximately caused Ms. Sumasar, an innocent woman, to be falsely arrested, maliciously prosecuted, and wrongly jailed for more than six months, and to lose her livelihood and see her home go into foreclosure, as well as the other damages previously described.

235.    Defendants engaged in these acts within the scope of their employment and are entitled to indemnification pursuant to Gen. Mun. Law §§ 50-j, 50-k and 50-l and by contract.

### COUNT VIII

### *Respondeat Superior* Claim against City of New York and Nassau County

236.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

237.    At all times relevant to this Complaint, the individual defendants acted as agents of the City of New York, the New York Police Department, Nassau County, or the Nassau County Police Department in furtherance of the business, including law enforcement functions, of those entities, and within the scope of their employment or agency with those entities.

238.    The conduct by which the defendant officers and prosecutors committed the torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence was not undertaken for the individual defendants personal motives, but rather was undertaken while the individual defendants were on duty, carrying out their routine investigative functions as detectives, police officers, and criminal prosecutors, and engaging in such conduct as would have been reasonably expected by their employers. Indeed, the conduct of the individual defendants in committing the above-described torts was reasonably foreseeable by

Nassau County, County of Queens and the City of New York.

239. Under the doctrine of *respondeat superior*, the City of New York and Nassau County are liable for their agents' state law torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence.

**WHEREFORE**, Seemona Sumasar and Chiara McDonald pray as follows:

A. That the Court award compensatory damages to plaintiffs and against the defendants, jointly and severally, in an amount to be determined at trial;

B. That the Court award punitive damages to plaintiffs, and against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C. For a trial by jury;

D. For pre-judgment and post-judgment interest and recovery of plaintiffs' costs, including, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims, all costs available under 28 U.S.C. § 1920, and all other costs, including attorneys fees, available under applicable laws; and

E. For any and all other relief to which plaintiffs may be entitled.

Dated: December ____, 2011     Respectfully submitted,

Nick J. Brustin
Deborah L. Cornwall
Anna Benvenutti Hoffmann
Sonam Henderson
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
(212) 965-9081

**Attorneys for Plaintiff Seemona Sumasar**

Ex 1



**Jerry Ramrattan**
N Y P D former law enforcement
Greater New York City Area | Security and Investigations

| | |
|---|---|
| Current | • Owner at Most Wanted inc. |
| | • Co Owner at golden krust rest.& bakery |
| | • apo at former law enforcement |
| Past | • Co Owner at planet audio |
| Education | • City University of New York-John Jay College of Criminal Justice |
| Connections | 0 connections |

## Jerry Ramrattan's Summary

many year working with law enforcement an working in the priv.sector helping everyone at anytime an anywhere as well...

**Specialties**
as can fix anything an at any times trust me ok...

## Jerry Ramrattan's Experience

**Owner**
**Most Wanted inc.**
Food & Beverages industry
March 2006 – Present (5 years 4 months)

**Co Owner**
**golden krust rest.& bakery**
Food & Beverages industry
March 2005 – Present (6 years 4 months)

**apo**
**former law enforcement**
Law Enforcement industry
June 1994 – Present (17 years 1 month)

**Co Owner**
**planet audio**
Music industry
May 2000 – December 2008 (8 years 8 months)

## Jerry Ramrattan's Education

**City University of New York-John Jay College of Criminal Justice**
law, mulp.
1992 – 1995

## Jerry Ramrattan's Additional Information

## Jerry Ramrattan's Contact Settings

Jerry Ramrattan is not currently open to receiving Introductions or InMail™.

## View Jerry Ramrattan's full profile to...

• See who you and Jerry Ramrattan know in common
• Get introduced to Jerry Ramrattan
• Contact Jerry Ramrattan directly

View Full Profile

LinkedIn Corporation © 2011