UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SEEMONA SUMASAR and CHIARA
McDONALD,

                        Plaintiffs,

            -against-

NASSAU COUNTY, NASSAU COUNTY
POLICE DETECTIVE LISA CHARLES,
NASSAU COUNTY POLICE DETECTIVE
DEBORAH CARTER BERSHAD, NASSAU
COUNTY POLICE DETECTIVE JOSEPH BRADY,
NASSAU COUNTY POLICE DETECTIVE
ROBERT NILL, NASSAU COUNTY POLICE
OFFICER MICHAEL KNATZ, and JOHN AND
JANE DOES 1-10,
                        Defendants.
------------------------------------------------------------------X

**MEMORANDUM
AND ORDER**
CV 11-5867 (ARL)

**LINDSAY, Magistrate Judge:**

Plaintiff Seemona Sumasar ("Sumasar") spent over six months in prison for crimes which

it is undisputed never occurred. She now brings this lawsuit, along with her daughter Chiara

McDonald ("Chiara") (collectively, "Plaintiffs"), pursuant to 42 U.S.C. § 1983 ("Section 1983")

against the Nassau County police officer and detectives who investigated the purported crimes

which led to her indictment. Before the Court is the motion by defendants Nassau County,

Nassau County Police Detective Lisa Charles ("Detective Charles"), Nassau County Police

Detective Deborah Carter Bershad ("Detective Bershad"), Nassau County Police Detective Joseph

Brady ("Detective Brady"), Nassau County Police Detective Robert Nill ("Detective Nill"), and

Nassau County Police Officer Michael Knatz ("Police Officer Knatz") (collectively, the "Nassau

County Defendants") for summary judgment pursuant to Federal Rule of Civil Procedure

("Rule") 56.  For the reasons set forth below, the Nassau County Defendants' motion is granted in part and denied in part.

## BACKGROUND

The following facts are drawn from the pleadings, the parties' Local Rule 56.1 Statements, and the parties' papers submitted in support of or in opposition to the instant summary judgment motion.  The facts cited are undisputed unless otherwise noted.  Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party.  *See Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).  Here, the facts are construed in the light most favorable to the Plaintiffs.

### I.       Sumasar's Background and Relationship with Jerry Ramrattan

The relevant facts regarding Sumasar's relationship with Jerry Ramrattan ("Ramrattan") are largely undisputed.  Sumasar is a forty-one year old woman who moved with her parents to the United States from Guyana in 1987.  Chiara is Sumasar's daughter and was born on January 16, 1998.  Chiara is the daughter of Sumasar and Devon McDonald ("Devon").  In 2010, Chiara was living with Sumasar, who had primary custody of Chiara, in Far Rockaway, New York.

After graduating from high school and attending college for two semesters, Sumasar spent the next fifteen years working at various investment firms, including Morgan Stanley, in New York City.  Between March and May of 2005, Sumasar entered into a franchise agreement with Golden Krust Franchising, Inc. to own and operate a Golden Krust restaurant in Richmond Hill, New York.  Between 2006 and 2008, Sumasar managed the restaurant on a part-time basis while still working at Morgan Stanley.  In 2008, Sumasar left Morgan Stanley and worked full-time managing the Golden Krust restaurant.

In mid-2006, after she opened her restaurant, Sumasar met Ramrattan, and they began dating. While Sumasar was in her relationship with Ramrattan, he lived with her at her house in Far Rockaway. When Sumasar met Ramrattan, he told her that he owned a security company and that he worked as an investigator for the Brooklyn District Attorney's Office. He also told Sumasar that he was divorced and had one child. After she began her relationship with Ramrattan, Sumasar learned that Ramrattan had been lying to her. For example, Sumasar discovered that Ramrattan was married to another woman and had three children. As a result, in 2008, Sumasar broke off her relationship with Ramrattan. After the break-up, Ramrattan asked Sumasar if he could live in the basement of her house for two weeks; Ramrattan ended up staying in the basement for months. While he lived at Sumasar's house, Sumasar saw Ramrattan carry a gun. She also saw a bulletproof vest in the trunk of his vehicle and a police department shield and badge in his wallet.

It is undisputed that on March 8, 2009, Ramrattan raped Sumasar. According to Sumasar, Ramrattan ambushed Sumasar on the back stairs outside her apartment and dragged her into his basement apartment. Using duct tape, Ramrattan bound Sumasar's hands and legs and gagged her. Over the course of eight or nine hours, Ramrattan held Sumasar prisoner while he threatened to commit suicide with his gun, menaced her with the same gun, and raped her. After pleading with Sumasar not to tell anyone what he had done, Ramrattan eventually freed her.

Ramrattan was arrested, charged with rape, and eventually indicted by a Queens grand jury. In addition to investigating and prosecuting Ramrattan for sexual assault, the New York City Police Department (the "NYPD") also investigated him for impersonating a police officer

after Sumasar told them that Ramrattan posed as a police officer and provided them with a picture of him wearing a NYPD uniform, including a police shield.

According to Sumasar, after Ramrattan made bail, he began a campaign of harassment designed to coerce her to cease cooperating with the rape prosecution. Despite a restraining order mandating that he not contact her, he telephoned her to demand that she not go through with the case. He also sent a parade of friends and relatives to her restaurant to lobby on his behalf. They told her that if she went through with the case, they and/or Ramrattan would make her life miserable. According to Sumasar, when she reported these visits to the police, she was told that nothing could be done unless Ramrattan tried again to contact her directly.

## II.    Ramrattan's Elaborate Scheme to Frame Sumasar for Crimes she did not Commit

In an escalated effort to attack Sumasar's credibility, Ramrattan then orchestrated a bold scheme to frame Sumasar for committing armed robbery while posing as a police officer. The facts surrounding these false allegations are largely undisputed.

### A.    The Reported Robberies to the NYPD

#### 1.    The First Reported NYPD Robbery: Rajive Mohanlal

Ramrattan began by inducing an illegal immigrant named Rajive Mohanlal ("Mohanlal") to call a Queens precinct of the New York City Police Department on September 15, 2009, and falsely report that he had been accosted and robbed by two people posing as police officers, aided by a third individual. Additionally, Ramrattan gave Mohanlal handcuffs and a bullet casing to plant at the scene. Mohanlal told the police that as he was walking, a gray Jeep Cherokee with compound on the driver's side front door and with New York plates pulled up next to him. He reported that an Indian woman wearing a black bullet-resistant armor with a shield on it holding a

4

black semi-automatic and a white male wearing a shield around his neck approached him, handcuffed him, and robbed him. Mohanlal also told the police that a second vehicle approached, a black Maxima with Pennsylvania plates and asked if they were okay, and the female waved them on. Mohanlal's description of his female assailant was consistent with Sumasar, and the description of the two vehicles involved in the alleged incident were consistent with Sumasar's friends' vehicles, which Sumasar sometimes drove.

### 2. The Second Reported NYPD Robbery: Christopher Conde

Ramrattan next induced long-time friend, Queens resident Christopher Conde ("Conde"), to call the NYPD two days later, on September 17, 2009, and falsely report that as he walked in Queens in the middle of the night, he was robbed by a female and two males posing as police officers and that the female displayed a firearm. Conde reported that the alleged robbers fled the scene in a black Nissan Maxima with Pennsylvania plates and a Jeep Cherokee described as metallic blue or gold. Conde's description of his female assailant was consistent with Sumasar's height and weight, and Conde's description of a black man driving a black Nissan Maxima with Pennsylvania places was consistent with Devon, the father of Sumasar's daughter, Chiara.

Both complaints were investigated by NYPD James Conlon ("Detective Conlon"). According to Detective Conlon's deposition testimony, after the NYPD exhausted all possible investigative avenues for the alleged robberies and found nothing, they closed the cases.

### B. The Reported Robberies to the NCPD

### 1. The First Reported Nassau County Robbery: Terrell Lovell

Approximately six months after his unsuccessful attempts to frame Sumasar for crimes she did not commit in Queens, Ramrattan decided to try his hand in Nassau County. Ramrattan

began by recruiting Terrell Lovell ("Lovell"), a common friend of Ramrattan and Mohanlal, to report an armed robbery, telling Lovell that he would pay Lovell $20,000 to frame Sumasar for armed robbery. On March 2, 2010, Lovell contacted the Nassau County Police Department (the "NCPD") via 911 at about 1:25 a.m. and reported that he had just been the victim of a robbery. After the call, Detective Charles and Detective Bershad responded to the scene and interviewed Lovell.

In Lovell's sworn statement, he stated that he was pulled over by a black male and an Indian female driving a charcoal-grey Cherokee with partial gold rims and tints as well as a partial plate "NY AJD." Lovell averred that both individuals were wearing bullet-proof vests and had shields hanging from chains around their necks. He also stated that the female had a gun in her hand. According to Lovell, the female told him to get out of his car and robbed him.

On March 2, 2010, Detective Charles contacted the NYPD's 101 Precinct and the NYPD Robbery Squad for similar cases within New York City. Detective Charles was referred to the Internal Affairs Unit, where she spoke with Detective Conlon. Detective Conlon stated that New York City had two similar cases in September 2009 around the same time of 1:00 a.m. In addition, on March 3, 2010, Detective Bershad telephoned Lovell and asked him to describe the Jeep Cherokee further and, if possible, to search the internet to locate a picture that most resembled the Jeep Cherokee used in the reported robbery. Lovell responded via email with a picture of a Jeep Cherokee which, according to her, was very similar to the one used in the alleged robbery.

### 2. The Second Reported Nassau County Robbery: Anonymous Caller

On May 2, 2010, an anonymous male, possibly Ramrattan himself, called the Fourth Precinct at 3:50 a.m. to report that he had just been stopped by two individuals posing as undercover police officers in a Jeep Cherokee in the Five Towns Shopping Center in North Woodmere, Nassau County. He described the female as Indian with a ponytail dressed all in black with a vest, holster, gun and a detective badge displayed around her neck. He also reported that there was a black male dressed somewhat the same. The anonymous caller stated that he was patted down at gunpoint, but nothing was taken. He identified the Jeep Cherokee as gold and bearing Florida license plate number "839NEK." The caller refused to identify himself or give his location.

Detective Charles investigated the Florida license plate "839NEK" and found it was registered to Lalanee Sumasar, Sumasar's sister living in Orlando, Florida, and that Seemona Sumasar's Far Rockaway address was linked to it. In May 2010, Sumasar was driving a Nissan Maxima owned by Devon McDonald.

### 3. The Third Reported Nassau County Robbery: Luz Johnson

The last person enlisted by Ramrattan was Luz Johnson ("Johnson"), who first met Ramrattan in 1980 when she dated Ramrattan's brother. In May 2010, Ramrattan, who knew the manager of a GVS store in Brooklyn, New York, helped Johnson get a job at the store.

Ramrattan told Johnson he was having problems with Sumasar, that Sumasar had charged him with rape, and that the case was going to trial. He promised to pay her a few thousand dollars if she would report to the Nassau County Police that while she was driving, she was pulled over by a female and two men who were impersonating police and who were wearing vests, badges

and guns. Ramrattan coached her on the plan. For example, in Johnson's presence, Ramrattan wrote some terms on a matchbook cover, including "Sunshine state," "839-NEK," "FLA," "Jeep four-door," and "CHR." Ramrattan told Johnson that "839-NEK" was the Florida license plate of the Jeep Cherokee that Sumasar was driving.

On May 19, 2010, Johnson called the NCPD via 911. Johnson reported that she had been the victim of a robbery at about 1:25 a.m. while driving in Inwood, Nassau County. Detective Nill responded to the location. At the scene, Johnson gave the matchbook to Detective Nill and told him that she wrote the license plate number and names on the matchbook. In a sworn statement, she stated that she was pulled over by a two-toned brown Grand Cherokee with a red flashing light and Florida plate number "839NEK." She reported that a female, possibly Spanish or Indian, wearing a bullet-proof vest with a shield around her neck, asked Johnson for her registration and insurance card and told her to get out of the car. When she got out of her car, she saw a black male wearing the same style bullet-proof vest and a shield around her neck with a black handgun in a holster around his waist. According to Johnson, she was told to open her trunk, and the female stole $1400.00 in cash and miscellaneous items. She reported that there was also a third person – a black male – wearing a vest and shield. The three individuals then allegedly fled the scene.

### C. The Investigation into the Reported Crimes

Johnson's description of a Jeep Cherokee bearing Florida license plate "839NEK" matched exactly with the vehicle and license plate provided by the anonymous male caller on May 2, 2010. On May 19, 2010, Detective Charles filed a Request for a DMV Photo Image of Lalanee Sumasar, the registered owner of the Jeep.

A May 19, 2010 ClaimSearch for insurance claims submitted by Lalanee Sumasar identified one passenger involved in one incident as Chiara McDonald, whose address was listed as Sumasar's address in Far Rockaway. Detective Charles then filed a Request for a DMV Photo Image of Seemona Sumasar and received a photograph of her face. Detective Nill obtained DMV photographs of five similar-looking females and placed them in a six-pack photo array for possible identification by Lovell and Johnson.

That same day, Detective Nill went to Lovell's home to show him an array of six head-shot photographs of females similar in appearance to Sumasar. Lovell knew what Sumasar looked like because Ramrattan had previously shown him multiple photographs of Sumasar taken in the past couple of years. Ramrattan also coached Lovell about what to say when he would be shown the photo array. Based on his prior knowledge of what Sumasar looked like, Lovell positively identified Sumasar as the woman who robbed him and swore to this in writing.

The next day, on May 20, 2010, Detectives Nill and Charles drove to the GVS Store in Brooklyn where Johnson worked and showed her the same photo array. Johnson recognized Sumasar from a photograph that Ramrattan had previously shown her and from having seen Sumasar briefly at the Golden Krust. In her second sworn statement, Johnson positively identified Sumasar as the woman who robbed her on May 19, 2010.

According to Defendants, on May 20, 2010, Detective Nill also showed Johnson a Mugshot Profile of Jerry Ramrattan, and a six-photo array of male head shots including Ramrattan, whose name came up from Nill's computer search as living at Sumasar's Far Rockaway address. Detective Nill claims that Johnson denied recognizing him or anyone else in the photo array. Plaintiffs dispute this statement, noting that in her deposition testimony, Johnson

could not recall if the police officers ever showed her a photograph of Ramrattan or any male suspects.

On May 21, 2010, Detective Nill ran a computer National Comprehensive Report Search for Seemona Sumasar.  The report revealed that she was owner of a residence in Far Rockaway; that she had a recent address there; and that her sister, Lalanee, was the registered owner of a 1999 Jeep Grand Cherokee, the same make and model as the vehicle used in the three reported armed robberies.

**D.    Johnson's False Report of a Car Break-In**

In the late evening of May 20, 2010, or the early morning of May 21, 2010, Ramrattan told Johnson he wanted her to call police a second time, this time from where Johnson lived in Engelwood, New Jersey, and report that her car was broken into.  Ramrattan stated it was because he wanted to make sure the police actually arrested Sumasar.

At 4:03 a.m. on May 21, 2010, Johnson placed a telephone call to the Engelwood Police Department to report that her car was broken into and that her cousin, "Chris Johnson," who was in fact Ramrattan himself, was a witness to the break-in.  When the Engelwood Police arrived, Johnson told them that she was woken up by her alarm on her vehicle going off.  When she went outside to check her vehicle, she saw a man open the door to her vehicle.  As soon as the man saw her, he got into the passenger side of a black Nissan Maxima with Pennsylvania plates "RR7031" and took off with another party.   Johnson stated to the Officer that nothing was taken from the vehicle, and there was no damage to the vehicle.  Apparently, Johnson told the police that when she was robbed on May 19th, some mail with her sister's address on it and a spare key had also

been stolen, which supposedly explained how the robbers had been able to trace Johnson to New Jersey on May 20th.

Later that day, Detective Nill ran the Pennsylvania license plate "RR70K1" in a New York City ticketing and accident report database that showed it belonging to a black Nissan Maxima and that the plate had been ticketed twice at an address in Richmond Hill, Queens. In addition, the report showed Seemona Sumasar was involved in an accident on September 6, 2005, using this black Nissan Maxima with this license plate.

### E.     Sumasar is Taken to the Police Station

On May 21, 2010, Police Officer Knatz arrived at the Golden Krust restaurant in Richmond Hill, Queens, and was told by Detectives Nill and Charles that they had found a car parked near the Golden Krust restaurant, a black Nissan Maxima, which they believed was used in multiple robberies by people impersonating police officers. The detectives told Knatz that they were looking to arrest the person who was driving that car, if the person did, in fact, get in the car. Hours later, Sumasar exited the restaurant and got into the black Nissan Maxima. At Detective Charles and Nill's instruction, Police Officer Knatz pulled Sumasar over, and Detectives Charles and Nill drove Sumasar to the police station.

### F.     Sumasar's Interrogation by Detective Charles

At this point, the parties' stories begin to diverge. Upon arrival at the police station, Detective Charles read Sumasar her Miranda rights and interrogated her until 3:00 a.m. on May 22, 2014. According to Sumasar, the interrogation lasted for eight hours. Pls.' Rule 56.1 Counterstatement ¶ 25. Detective Brady took notes of the interrogation.

It is undisputed that during the course of the interrogation, Sumasar discussed the following items: (1) that she owned a residential building in Far Rockaway, a two-level house in which she lived and rented out some rooms; (2) that she was owner of the Golden Krust restaurant on Liberty Avenue; (3) that she did at one point own and drive a tan Jeep Grand Cherokee, which was connected to the May 2, 2010 and May 19, 2010 robberies in which the victims identified the license plate as Florida number "839-NEK,"; (4) that this Jeep Grand Cherokee was at one point registered to her sister, Lalanee, in Florida but was presently being driven in New York by one of her ex-boyfriends; (5) that she had a current boyfriend named Devon McDonald, the father of her twelve year-old daughter, Chiara McDonald, and that Devon lived separately from her nearby in Far Rockaway; (6) that Devon owned the black Nissan Maxima with the Pennsylvania license plate "RR70K1" she was driving that day and that Devon loaned her the car for the past two or three weeks; (7) that she had an ex-boyfriend name Jerry Ramrattan ("Ramrattan") who used to live in the basement of her house; (8) that Ramrattan pretended to be a New York City police officer or detective; (9) that Ramrattan had more than one gun, a bulletproof vest and a police badge, which he kept in the basement and in the trunk of his car. After finishing taking notes when the interrogation was concluded, Detective Brady gave his notes to Detective Charles. Both detectives testified at their depositions that the notes were complete. Charles Dep., dated Oct. 24, 2013 ("Charles Dep.") at 169-71; Brady Dep., dated Dec. 16, 2013, at 51-52.

According to Sumasar, Detective Charles did not tell her anything about the charges against her, leaving her to guess why she had been arrested. Pls.' Rule 56.1 Counterstatement ¶ 3. After several hours, Detective Charles finally indicated that Sumasar was suspected of participating in a robbery. *Id.* Sumasar claims that from the moment she learned that she was

suspected of impersonating a police officer to commit armed robberies, she made it clear that she believed Ramrattan was behind the incidents. *Id.* ¶ 65. Sumasar told Detective Charles about Ramrattan and the pending rape trial; about Ramrattan's tendency to impersonate police officers; that she had seen a bulletproof vest in the trunk of Ramrattan's car; and that she had seen Ramrattan with a police shield and gun on many occasions. *Id.* In fact, it is undisputed that Ramrattan operated a security company and portrayed himself as former NYPD law enforcement on his company's webpages. *Id.* ¶ 77. In addition, Detective Charles's notes indicate that she learned from the Queens DA's Office that "Jerry the Cop" portrayed himself as a detective, *id.* ¶ 79, though she later testified that she could not recall learning this information, *id.* ¶ 85.

Detective Charles testified that she was familiar with Ramrattan before the interrogation as she had run his rap sheet the morning before. Charles Dep. at 320. The rap sheet revealed that Ramrattan had four felony charges, including two violent and one firearms charge. *Id.* at 323. It also indicated that he had three convictions, including one felony and two misdemeanors. *Id.* According to Sumasar, she saw that Detective Charles had a picture of Ramrattan clipped to the file she brought into the interrogation. Pls.' Rule 56.1 Counterstatement ¶ 4. Although she repeatedly told Detective Charles that the only possible explanation for these charges was that Ramrattan had set her up, Detective Charles allegedly told Sumasar that the charges had nothing to do with Ramrattan. *Id.* ¶¶ 3-4.

G.     **Sumasar's Arrest**

Following the interrogation, Sumasar was placed under arrest and charged with eight felonies, including two counts of Robbery in the First Degree, New York Penal Law § 160.15(4); two counts of Criminal Use of a Firearm, Penal Law § 265.09, two counts of Criminal

Impersonation in the First Degree, Penal Law § 190.26; and two counts of Unlawful Wearing of a Body Vest, Penal Law § 270.20. Sumasar was placed in custody, arraigned in Hempstead District Court on $1 million bail and then brought to Nassau County Correctional Center in East Meadow, New York.

### H. The Investigation by the Nassau County DA's Office

Nassau County Assistant District Attorney Jessica Cepriano ("ADA Cepriano") prosecuted the case against Sumasar. At her deposition, ADA Cepriano testified that she never spoke to Sumasar outside of the grand jury or the hearing process, and she never interviewed her. ADA Cepriano Dep., dated Dec. 18, 2013 ("ADA Cepriano Dep.") at 24, 29. In this regard, she relied "heavily" on Detectives Charles and Nill. *Id.* at 30. Detective Nill was her primary source for information about the case, although she also relied on Detective Charles, whom she spoke to about the case at least fifteen times. *Id.* at 24-25. In particular, she relied "exclusively" on Detective Charles to provide her with information about the substance of her interrogation of Sumasar, as Detective Nill did not participate in that process. *Id.* at 24-25, 33. In that regard, ADA Cepriano reviewed Detective Brady's notes of Detective Charles's interview of Sumasar and spoke with Charles about it. *Id.* at 97-98. Although ADA Cepriano did not interview Sumasar, she did interview Johnson and Lovell and found them to be very credible. *Id.* at 29-30.

#### 1. Sumasar's Financial Problems

Before ADA Cepriano presented the case to the grand jury, Detective Charles told her that Sumasar had begun the interview by expressing that she had financial problems and that her business was not doing well. Charles Dep. at 183-85; Cepriano Dep. at 81-82, 97-99. ADA Cepriano thereafter received information about Sumasar's financial problems from the detectives.

Cepriano Dep. at 101-02. ADA Cepriano testified that the fact that Sumasar was having financial problems was "important because it was a potential motive for the crimes," *id.* at 103, but she later acknowledged that this was not going to be the centerpiece of her case against Sumasar; rather, it was just "another building block." *Id.* at 107.

According to Sumasar, she never disclosed that she had any financial problems to Detective Charles during her interrogation. Pls.' Rule 56.1 Counterstatement ¶ 62. Sumasar's claim is supported by Detective Brady's original notes and Charles's additions, neither of which contain any reference to Sumasar's alleged statements regarding financial problems. *Id.* ¶ 63.

### 2. Sumasar's Alibi

Within one week of Sumasar's arraignment, ADA Cepriano became aware that Sumasar had an alibi defense that she was at the Mohegan Sun Casino in Connecticut on May 19, 2010, the night Johnson claimed she was robbed by Sumasar and two men, and ADA Cepriano began investigating Sumasar's alibi. Cepriano Dep. at 34-35. According to ADA Cepriano's testimony, she found it "strange" that Sumasar had not mentioned her alibi while being interrogated by Detective Charles; instead, Sumasar had mentioned another trip she took to the casino on a date not relevant to the crimes for which she was being investigated. *Id.* at 174-75. "[I]f she had mentioned one casino visit, why not others," ADA Cepriano wondered. *Id.* at 176.

Detective Charles testified that during the May 21-22 interrogation, she discussed the dates of the reported crimes and asked Sumasar where she was two nights ago, the date of the purported last robbery. *Id.* at 169-71. ADA Cepriano could not specifically recall if Detective Charles told her that she discussed specific dates with Sumasar. *Id.* at 168-69. Nonetheless, when confronted with Detective Charles's testimony, ADA Cepriano conceded that Detective

Charles must have relayed such information to her. *Id.* at 170-72, 177. As ADA Cepriano testified, "[I]f it's in the hearing, I'm sure [Detective Charles] told me [about asking Sumasar about her whereabouts on May 19th]. *Id.* at 171. ADA Cepriano agreed that if Sumasar was asked about her whereabouts on May 19th and did not mention her alibi at that time, that was a "big problem." *Id.* at 176; *see also id.* at 177.

Sumasar contends, however, that Detective Charles never told her the dates of the alleged robberies and never mentioned May 19th at all. Pls.' Rule 56.1 Counterstatement ¶¶ 35, 49. Instead, Sumasar claims she did not learn the dates of the alleged crimes until her arraignment the next day. *Id.* ¶ 35. Sumasar's claim is supported by Detective Brady's contemporaneous 21-page notes of the interrogations, which Detective Charles subsequently reviewed and found to be complete, as they make no mention of the May 19th date. *Id.* ¶ 49.

Because the modus operandi of these reported crimes was distinctive – a young Indian woman committing armed robberies – the NCPD detectives were investigating them as a linked pattern. *Id.* ¶¶ 37, 47. Thus, an alibi for one of the crimes would have been important evidence of innocence for all of the crimes. *Id.*

ADA Cepriano's investigation of Sumasar's alibi defense included reviewing time-stamped photographs taken at the Mohegan Sun Casino in Connecticut that night, as well as reviewing Sumasar's cell phone records. Cepriano Dep. at 35-40. Photographs taken at the casino that night revealed a woman whom ADA Cepriano thought looked like Sumasar, but the photos were not dispositive evidence. *Id.* at 35, 122-23. Cell phone records showed that Sumasar's cell was used in Connecticut about an hour and a half to two hours after the time of the robbery. *Id.* at 38. While ADA Cepriano thought this evidence was also relevant, she did not

think it was dispositive; it was conceivable that Sumasar committed the crime and drove to Connecticut within that time frame or, more likely, another individual had used her cell phone. *Id.* at 38-40. ADA Cepriano had conversations with Detectives Charles and Nill about this evidence; both believed that Sumasar had committed the crimes. *Id.* at 40-41. Lastly, ADA Cepriano contacted security personnel at the Mohegan Sun to see if there were any relevant videos or other photographs but was told that everything had been deleted. *Id.* at 36.

### 3. Investigation into Ramrattan

ADA Cepriano also conducted an investigation into Ramrattan, including running his phone records for two numbers she had for him; running Johnson and Lovell's phone records; searching Ramrattan's Facebook page; and examining potential connections between Ramrattan and Johnson and Lovell. *Id.* at 43-45. She also asked Johnson and Lovell whether they knew Ramrattan, and they replied they did not. *Id.* at 44-45. ADA Cepriano was aware that Ramrattan held himself out as a police officer on his website where there were pictures of him in police gear. *Id.* at 44-47, 53-54.

ADA Cepriano asked Detectives Charles and Nill to conduct an investigation to determine whether Ramrattan participated in the crimes. *Id.* at 59-60. She also asked Detectives Charles and Nill whether they had any prior interaction with Ramrattan, and they both replied that they had not. *Id.* at 47-48. ADA Cepriano further testified that had either of the detectives had any such interaction, such knowledge would "[a]bsolutely" be of interest to her and very important. *Id.* at 48, 55. During ADA Cepriano's investigation, however, she discovered that Detective Charles had in fact previously interacted with Ramrattan when Detective Charles was assigned a hit-and-run case where he was the complainant. *Id.* at 63-71; Charles Dep. at 29-30, 35-36. ADA

Cepriano's sense from looking at reports of this case was that Ramrattan was involved in some sort of scam, either for insurance money or to get the other person involved to pay him off. Cepriano Dep at 65-66. When ADA Cepriano spoke with Detective Charles about the prior car accident case and Charles's prior interaction with Ramrattan, Detective Charles claimed that she had forgotten her past interaction with. Cepriano Dep. at 67-68. At her deposition, however, Detective Charles admitted that she remembered Ramrattan's "unique" name and that when his name came up at the beginning of Sumasar's investigation, she had recalled that she had a prior case with him and pulled the file. Charles' Dep. at 35-36.

It was ADA Cepriano's understanding, based on Detectives Charles and Nill's reports of their investigation into Ramrattan, that they both believed that Sumasar committed the crimes. Pls.' Rule 56.1 Counterstatement ¶ 86. Although Detective Charles denies it, the other investigating officers all testified that Detective Charles was the lead detective on the case. *Id.* ¶¶ 20-22. At her deposition, Detective Charles stated that she did not recall whether she investigated Ramrattan after her interrogation. Charles Dep. at 297-98.

### 4. Sumasar's Demeanor

Before ADA Cepriano presented the case to the grand jury, Detective Charles told her that Sumasar had an odd demeanor during the interrogation. Cepriano Dep. at 177-89. Detective Charles described Sumasar as "extremely calm and unconcerned." *Id.* at 185-86. ADA Cepriano believed Detective Charles's characterization and had no reason to doubt her. *Id.* at 184. Sumasar's alleged unconcerned attitude was "very peculiar" to ADA Cepriano, and she believed it was "indicative of someone who [wa]s capable of lying." *Id.* at 183.

Although ADA Cepriano did not specifically recall Detective Charles relaying to her that Sumasar was unconcerned about her daughter during the interrogation, *id.* at 185, 188, at the grand jury hearing, ADA Cepriano questioned Detective Charles about Sumasar's demeanor during the interrogation; Detective Charles responded that Sumasar was unconcerned, stern, and "she never seemed to be concerned about where her child was." *Id.* at 178. At the time of the interrogation, Sumasar was a single mother living with her twelve-year-old daughter, Chiara. Pls.' Rule 56.1 Counterstatement ¶ 52.

According to Sumasar, Detective Charles's representations about her demeanor during the interrogation were untrue. For example, Sumasar claims that during the interrogation, she asked Detective Charles many times to speak to her daughter, but Detective Charles refused. *Id.* ¶ 54. In addition, the morning after Detective Charles's interrogation, NYPD Detective Valle interviewed Sumasar and described her as a "mess" because she was crying so much. Pls.' Ex. 24 at 111, 114, 123-25

I.    **Sumasar's Indictment in both Queens and Nassau County**

In June 2010, ADA Cepriano presented Sumasar's case to a grand jury, at which time Lovell testified that Sumasar and others robbed him on March 2, 2010. Johnson also testified at the same grand jury that Sumasar and others had robbed her on May 19, 2010. Sumasar also testified at the grand jury.

On June 21, 2010, a Nassau County grand jury indicted Sumasar for the crimes of Robbery in the First Degree, two counts; Robbery in the Second Degree, two counts; Robbery in the Third Degree, two counts; Grand Larceny in the Fourth Degree, two counts; Petit Larceny, two counts; Criminal Use of a Firearm in the First Degree, two counts; Criminal Impersonation in

the First Degree, two counts; and Unlawful Wearing of a Body Vest, two counts.  In addition, after being arrested on May 21, 2010 by the NCPD, Sumasar was also indicted in Queens County based on Mohanlal's allegations and charged with Robbery in the First Degree.  Sumasar's bail was set at $1,000,000, which she could not post, and she remained incarcerated.

**J.  Lovell and Johnson Identify Sumasar at a Lineup**

On September 9, 2010, having already identified Sumasar from the photo array, Lovell and Johnson reinforced their identifications of Sumasar after viewing a live, in-person lineup of six females at the Nassau County Robbery Squad.  Johnson signed a sworn statement under penalty of perjury confirming her identification.

**K.  Sumasar's Exoneration and Ramrattan's Imprisonment**

After Sumasar had been in jail for over six months, the Nassau County District Attorney's Office received a tip from an informant that Ramrattan was framing Sumasar for the police-impersonation robberies.  Lovell and Johnson were asked to come into the District Attorney's Office to discuss the case.  In separate interviews, they both confessed to lying about the robberies, the photo-array and lineup identifications of Sumasar, and admitted that the robberies they reported were part of a conspiracy engineered by Ramrattan in order to frame Sumasar.  Lovell and Johnson were arrested, pled guilty to perjury, and was sentenced to six months in jail plus probation for four years.  In addition, Rajive Mohanlal was arrested by the NYPD and charged with perjury, conspiracy, tampering with a witness, and falsely reporting an incident based on his allegations that Sumasar robbed him on September 15, 2009.  Sumasar was released from Nassau County Correctional Center on December 2, 2010, and her indictment was dismissed on January 11, 2011.  Ramrattan was subsequently tried in state court and convicted of Rape in

the First Degree, Perjury in the First Degree, and Tampering with a Witness in the Third Degree. He was sentenced to a term of 32 years in prison.

## III.      Procedural Background

Plaintiffs commenced this action on December 1, 2011, against the Nassau County Defendants, as well as against the City of New York and New York City Detectives John Conlon and Marisa Valle (collectively, the "City Defendants"). The complaint asserts eight causes of action: (1) false arrest and malicious prosecution in violation of the Fourth Amendment; (2) a deprivation of due process in violation of the Fourteenth Amendment; (3) interference with Plaintiffs' family relationships in violation of the First and Fourteenth Amendment; (4) a civil rights conspiracy in violation of Section 1983; (5) false arrest and malicious prosecution in violation of New York law; (6) intentional, reckless, and negligent infliction of emotional distress; (7) negligence; and (8) a respondent superior claim against the City of New York and Nassau County. Both sets of Defendants filed motions to dismiss the Complaint pursuant to Rule 12(b)(6). By Order dated January 18, 2013, District Judge Wexler denied both motions. That same day, the parties consented to conduct this case before a Magistrate Judge for all purposes, and the case was reassigned to Magistrate Judge Boyle. DE 40.

Plaintiffs thereafter settled their claims with the City Defendants. On April 5, 2013, Plaintiffs filed two stipulations dismissing all claims against the City Defendants. DE 43, 44. The stipulations were so ordered by the Court on April 8, 2013.

On July 19, 2013, the case was reassigned to the undersigned. On August 3, 2015, the Nassau County Defendants filed the instant motion for summary judgment. In their Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, Plaintiffs

voluntarily dismiss all claims against Detective Bershad, Detective Brady, Detective Nill and Police Officer Michael Knatz. In addition, Plaintiffs voluntarily dismiss Count IV of the complaint, which asserts a claim for conspiracy under Section 1983. Accordingly, these claims are hereby dismissed. The only remaining claims are Counts I-III and V-VIII against defendants Nassau County and Detective Charles.

## DISCUSSION

### I.        Standard of Review

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of any genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party. *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005).

Where the movant shows a prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id.*; *see McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.");

22

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor."). Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see Dobbs v. Dobbs*, No. 06-CV-6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims.") (internal quotation marks omitted).

With the foregoing principles in mind, the Court now turns to an analysis of Plaintiffs' claims.

## II.     Analysis

As noted above, seven causes of action remain against defendants Nassau County and Detective Charles only. The Court will address the parties' arguments in the order in which they are raised in the briefs.

### A.     Sumasar's Due Process Claims

Count II asserts that Defendants deliberately fabricated inculpatory evidence against Sumasar, thereby depriving her of her due process rights under the Fourteenth Amendment. The constitutional right to due process is violated when police officers provide false or misleading information to a court or prosecutor for use in criminal proceedings. *See Bermudez v. City of New York*, 790 F.3d 368, 376 (2d Cir. 2015) (finding that fact issues precluded summary judgment on plaintiff's due process claim against detectives for providing misleading information to prosecutor regarding identification procedures used to implicate plaintiff in state criminal proceedings);

*Zahrey v. Coffey*, 221 F.3d 342, 344 (2d Cir. 2000) ("It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.").[1]

In addition, a due process violation "may also arise where the police or prosecutors withhold material exculpatory or impeaching evidence from a defendant. The latter theory of liability is essentially a civil claim seeking damages for a Brady violation." *Fappiano v. City of New York*, No. 15-260-cv, 2016 WL 860255, --- F. App'x ---, at *1 (2d Cir. Mar. 7, 2016) (citing *Bermudez*, 790 F.3d at 376 n.4) ("Police officers can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors.")).

In *Bermudez*, the plaintiff asserted several due process claims against the investigating police officers under Section 1983, alleging that they used unconstitutionally suggestive identification procedures and that they coerced witnesses. 790 F.3d at 374. The district court granted summary judgment for the officers, finding that the "prosecutor's independent decision to bring charges was an intervening cause that cut off liability." *Id.* The district court determined that the prosecutor could not have been misled by the officers because he participated in the investigation and had interviewed all of the witnesses who had viewed the lineup. *Id.* at 375.

---

[1] A plaintiff may bring a due process claim even if he or she was not actually tried. *See Ricciuti*, 124 F.3d at 127 (finding questions of fact on plaintiff's due process claim where charges were dismissed before trial); *Douglas v. City of New York*, 595 F. Supp. 2d 333, 346 (S.D.N.Y. 2009) ("The Second Circuit has permitted a claim under § 1983 for violation of the right to a fair trial to proceed even where no trial took place.") (citing *Ricciuti*).

The Second Circuit reversed, finding that even though the prosecutor had performed his own investigation, a reasonable jury could still find that that his decision to prosecute was proximately caused by the officers' conduct. *Id.* Specifically, "a jury could find that [the officers'] alleged failure to inform [the prosecutor] about problems in the initial questioning of these witnesses could have prevented [the prosecutor] from making an informed decision about the reliability of that evidence." *Id.* at 376. For example, because he was misinformed, the prosecutor "might have been led to conclude, incorrectly, that any defects in the witnesses' identifications were minor matters and for that reason could be ignored." *Id.* at 375. Alternatively, once the witnesses adopted a false story based on the suggestive identification procedure or the officers' coercion, "they might very well have decided to stick with that story (or become convinced that it was true), and for that reason have misinformed the ADA when he subsequently questioned them." *Id.* at 375-76. Thus, the Second Circuit held that "a jury could find that [the officers] remained a proximate cause of the deprivation of [the plaintiff's] due process rights." *Id.* at 376.

Here, Plaintiff asserts that there are genuine issues of material fact as to whether Detective Charles fabricated four specific types of evidence: (1) false evidence undermining Sumasar's true alibi; (2) false evidence indicating that Sumasar had a criminal personality; (3) false evidence that Sumasar had admitted to a financial motive for the crime; and (4) false evidence that Detective Charles had investigated Sumasar's true explanation that Ramrattan was framing her and had discovered it to be baseless. The Court agrees and finds that there is sufficient evidence for a jury to find that ADA Cepriano's decision-making process was tainted by misleading or false information provided by Detective Charles.

For example, ADA Cepriano testified that she never spoke to Sumasar outside of the grand jury or the hearing process, and she never interviewed her. Thus, she relied exclusively on Detective Charles to provide her with information about the substance of Detective Charles's interrogation of Sumasar. Detective Charles testified that during her interrogation, she had specifically asked Sumasar where she had been two nights earlier – the night of the last purported robbery. ADA Cepriano testified that she thought it was suspicious that Sumasar had been specifically asked about this date, yet Sumasar never mentioned going to the Mohegan Sun Casino on that date. Instead, Sumasar had mentioned an earlier trip to the casino. Detective Charles's testimony, however, is contradicted by both Sumasar's testimony (that she was never asked about that date) and Detective Brady's notes of the interrogation (which make no reference to that specific date). If Sumasar's testimony is credited, a jury could find that ADA Cepriano discounted Sumasar's alibi based on false information provided by Detective Charles and that this misinformation tainted her decision to bring charges.

In addition, Detective Charles told ADA Cepriano that Sumasar had a very odd demeanor during the interrogation in that Sumasar was extremely calm and unconcerned. ADA Cepriano testified that she had no reason to question Detective Charles's characterization, which she found to be very peculiar and indicative of someone who was capable of lying. There is evidence in the record, however, including the testimony of Sumasar and NYPD Detective Valle, which contradicts Detective Charles's assessment of Sumasar's demeanor.

Similarly, Detective Charles told ADA Cepriano that during her interrogation, Sumasar expressed that she had financial problems, and her business was not doing well. ADA Cepriano testified that she believed that Sumasar's financial problems were important because they

supplied a potential motive for the crimes.  Sumasar denies making these statements, and Detective Brady's notes include no reference to this alleged admission.

Lastly, there is evidence in the record supporting the fact that Detective Charles falsely reported to ADA Cepriano that she had investigated Ramrattan's role in the alleged crimes and had ruled out his participation.  ADA Cepriano testified that she asked Detectives Charles to conduct an investigation to determine whether Ramrattan participated in the crimes, and Detective Charles reported back that she believed that Sumasar was guilty.  At her deposition, however, and despite the testimony from her colleagues that she was the lead investigator, Detective Charles stated that she had no recollection as to whether she investigated Ramrattan at all.  ADA Cepriano also asked Detective Charles whether she had any prior interaction with Ramrattan, and Detective Charles falsely replied that she had not, despite the fact that she had previously been assigned a suspicious hit-and-run case where Ramrattan was the complainant.  At her deposition, however, Detective Charles admitted that she remembered Ramrattan's "unique" name and that when his name came up at the beginning of Sumasar's investigation, she had recalled that she had a prior case with him and pulled the file.  Indeed, when she walked into the interrogation room, she had Ramrattan's file with her.

Although these discrepancies may not constitute overwhelming evidence of fabrication, when viewing the record as a whole, they are enough to raise genuine issues of material fact.  Based on this record, a reasonable jury could find that Detective Charles provided ADA Cepriano with false or misleading information, resulting in the tainting of ADA Cepriano's investigation.

In support of their motion, Defendants urge the Court to consider the overwhelming undisputed evidence which supported Sumasar's arrest and indictment, including the sworn

statements by Lovell and Johnson; their photo pack identification of Sumasar; their sworn

identification of Sumasar at a live line-up; and their sworn testimony before the grand jury that

Sumasar had robbed them at gunpoint.[2] Defendants also argue that Sumasar's due process claims

must fail because based on this evidence, there was probable cause to indict her. The Second

Circuit has squarely rejected this argument:

> Each of the defendants insists that so long as there was probable cause for
> Alfred Ricciuti's arrest -- independent of the allegedly fabricated evidence --
> the fabrication of evidence is legally irrelevant. In essence, they argue that
> as long as the arrest complied with the Fourth Amendment, the Ricciutis can
> have no claim for post-arrest fabrication of evidence against them.
>
> This argument -- an ill-conceived attempt to erect a legal barricade to shield
> police officials from liability -- is built on the most fragile of foundations; it
> is based on an incorrect analysis of the law and at the same time betrays a
> grave misunderstanding of those responsibilities which the police must have
> toward the citizenry in an open and free society. No arrest, no matter how
> lawful or objectively reasonable, gives an arresting officer or his fellow
> officers license to deliberately manufacture false evidence against an
> arrestee.. . . [A] police officer's fabrication and forwarding to prosecutors of
> known false evidence works an unacceptable "corruption of the truth-seeking
> function of the trial process."

*Ricciuti*, 124 F.3d at 129-30; *see also Bermudez*, 790 F.3d at 376 n.5 ("[T]he absence of probable

cause is not an element of a due process claim.").

Accordingly, Defendants' motion for summary judgment on Count II of the complaint,

viz. Sumasar's due process claims, is denied.

---

[2] Sumasar, on the other hand, urges the Court to recognize all of the red flags Detective Charles
ignored, including that Ramrattan had been impersonating a police officer; that Ramrattan had
easily verifiable connections with the fake victims; and that Lowell had a prior conviction for
making a false report of a crime. *See People v. Ramrattan*, No. 882/09, Sentencing Hearing (Jan.
4, 2012), Pls.' Ex. 17 ("[T]he Nassau County police officers who were charged with investigating
the allegations against Miss Sumasar turned a blind eye and a deaf ear to her protests that it was
the defendant, Jerry Ramrattan, who was in fact behind these false allegations.").

**B.       Sumasar's Claims of Malicious Prosecution and False Arrest**

Count I asserts a claim for malicious prosecution and false arrest in violation of the Fourth Amendment.  Count V asserts these claims under New York law. The Court will address each claim in turn.

**1.       Malicious Prosecution**

Under Section 1983, in order to prevail on a malicious prosecution claim, "a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (internal citations omitted).  Sumasar's six-month detention undoubtedly qualifies as a post-arraignment seizure under the Fourth Amendment.  *See Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003).  Under New York law, however, Sumasar must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello*, 612 F.3d at 161 (citations and internal quotation marks omitted).   The first two elements are not in dispute here.

"'[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York," *id.* at 161-62 (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)), and 'indictment by a grand jury creates a presumption of probable cause,'" *id.* (quoting *Savino*, 331 F.3d at 72).   "That presumption may be rebutted only 'by evidence that the indictment was procured by "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith."'" *Id.* (quoting *Savino*, 331 F.3d at 72 (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 83 (1983)).   "Where there is some indication in the police records that, as to

a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment,' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome." *Id.* (quoting *Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003)). "'Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable "corruption of the truth-seeking function of the trial process."'" *Id.* (quoting *Ricciuti*, 124 F.3d at 130 (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976))).

As set forth in Point I above, a jury could find that Detective Charles engaged in such misconduct. For example, a reasonable jury could find that Detective Charles failed to make a complete and full statement of facts to ADA Cepriano, misrepresented or falsified evidence, or otherwise acted in bad faith. A jury could also find that Detective Charles failed to investigate Ramrattan's role in the incidents, including his connections to the fake victims. *See Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) ("The New York Court of Appeals has noted that 'the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'") (quoting *Colon*, 60 N.Y.2d at 82).

In addition, the Court finds that there is sufficient evidence in the record to permit an inference that Detective Charles proceeded against Sumasar with malice. First, "'[a] lack of probable cause generally creates an inference of malice.'" *Manganiello*, 612 F.3d at 163 (quoting *Boyd*, 336 F.3d at 78). Second, "'malice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff.'" *Id.* (quoting *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996)). Here,

malice can be inferred in light of the evidence that Detective Charles (1) told ADA Cepriano that she did not have any prior interaction with Ramrattan despite the fact that she had; (2) claimed she asked Sumasar crucial questions regarding her whereabouts on the night of the last reported robbery, questions which Sumasar denies being asked and are not reflected in Detective Brady's notes; (3) claims Sumasar told her she had financial problems, which Sumasar denies and is not reflected in Detective Brady's notes; (4) was unable to recall whether she had even investigated Ramrattan despite evidence that she had done so and was the lead investigator on the case; and (5) failed to adequately investigate Ramrattan and his connections to the fake victims. Accordingly, Defendants' motion for summary judgment is denied with regard to Sumasar's malicious prosecution claim.

### 2. False Arrest

The elements of a false arrest claim under Section 1983 are substantially the same as the elements under New York State law: Plaintiff must show that "the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Under both Section 1983 and New York State law, "the existence of probable cause is an absolute defense to a false arrest claim." *Jaegly v. Couch*, 439 F.3d 149, 151-52 (2d Cir. 2006); *see also Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015). In determining whether probable cause existed to support an arrest, the court "considers those facts available to the officer at the time of arrest and immediately before it," and renders its decision based on the "totality of the circumstances." *Simpson*, 793 F.3d at 265 (citation and internal quotation marks omitted).

Defendants maintain that Sumasar's false arrest claim should be dismissed because Detective Charles had probable cause to arrest Sumasar. Plaintiffs summarily respond by asserting that "[f]or the same reasons that Defendants lacked probable cause to prosecute, Defendants lacked probable cause to arrest Ms. Sumasar for the series of brazen robberies that never took place." Pls.' Mem. of Law at 28 n.13. The Court disagrees. Prior to Sumasar's arrest, both Johnson and Lovell provided sworn victim statements about the alleged robberies, and each independently identified Sumasar from a photo array and signed sworn statements that she was the woman who robbed them. *See Stansbury v. Wertman*, 721 F.3d 84, 91 (2d Cir. 2013) ("'[A]bsent circumstances that raise doubts as to the victim's veracity,' a victim's identification is typically sufficient to provide probable cause.") (quoting *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)). At this point in the investigation, there was no evidence that Ramrattan may have framed Sumasar, and Detective Chares had no reason to question the truthfulness of the witnesses. Although Plaintiffs argue that Detective Charles ignored red flags -- such as the fact that the second reported Nassau County crime was reported by an anonymous caller who chose not to call 911 and refused to give his identity or that the security guard on duty that night stated that he had observed nothing suspicious and the security videos showed no crime – "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti,* 124 F.3d at 128. It is true that Lowell had a prior conviction for making a false report of a crime. Nonetheless, because "probable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful[, i]t is . . . of no consequence that a more thorough or more probing investigation might have cast doubt upon the situation."

*Fabrikant v. French*, 691 F.3d 193, 214-215 (2d Cir. 2012) (citation and internal quotation marks omitted). Looking at the totality of the circumstances, the Court finds that Sumasar has failed to produce evidence from which a reasonable juror could infer that Detective Charles lacked a reasonable basis for believing that there was probable cause to arrest Sumasar. To the extent the First and Fifth Counts assert a claim for false arrest under Section 1983 and New York law, respectively, these claims are dismissed.

### C.     Absolute Immunity

Defendants argue that they are entitled to absolute immunity under *Rehberg v. Paulk*, 132 S. Ct. 1497 (2012). In *Rehberg*, the Supreme Court "announced the bright line rule that a grand jury witness, including a law enforcement officer, 'has absolute immunity from any § 1983 claim based on the witness' testimony,' even if that testimony is perjurious." *Coggins v. Buonora*, 776 F.3d 108, 112 (2d Cir. 2015) (quoting *Rehberg*, 132 S. Ct. at 1506). *Rehberg*, however, did not foreclose liability when a Section 1983 plaintiff alleges that an officer engaged in out-of-court misconduct in addition to committing perjury before the grand jury. In *Coggins*, the Second Circuit addressed that issue as follows:

> When a police officer claims absolute immunity for his grand jury testimony under *Rehberg*, the court should determine whether the plaintiff can make out the elements of his § 1983 claim without resorting to the grand jury testimony. If the claim exists independently of the grand jury testimony, it is not "based on" that testimony, as that term is used in *Rehberg*. *Id.* at 1506. Conversely, if the claim requires the grand jury testimony, the defendant enjoys absolute immunity under *Rehberg*.

*Id.* at 113.

Here, Plaintiffs have submitted evidence from which a juror could infer that Detective Charles engaged in out-of-court misconduct sufficient to support Sumasar's Section 1983 claims

independent of Detective Charles's grand jury testimony.  Accordingly, the Court finds that Defendants are not entitled to absolute immunity.

### D.      Qualified Immunity

"A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law, or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred, or (3) if the defendant's action was objective[ly] legal[ly] reasonable[ ] . . . in light of the legal rules that were clearly established at the time it was taken." *Manganiello*, 612 F.3d at 164 (internal citations and quotation marks omitted).  "Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact.  The factfinder must determine any disputed material facts, and on the basis of the facts permissibly found, the court must decide whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, i.e., whether officers of reasonable competence could disagree as to the lawfulness of such conduct." *Id.* (citations and internal quotation marks omitted).

For the reasons discussed above, there are genuine issues of material fact as to whether Detective Charles engaged in the misconduct alleged.  Should a jury find that Detective Charles did misrepresent the evidence to the prosecutor, or knowingly failed to pass on material information, such conduct would constitute a violation of clearly established law, and no objectively reasonable public official could have thought otherwise.  Accordingly, Defendants' motion for summary judgment on the grounds of qualified immunity is denied at this time.

### E.     Right to Intimate Association

Count III asserts a claim for interference with family relationships, i.e., that Sumasar's six-month imprisonment unconstitutionally interfered with her relationship with her daughter Chiara. Plaintiffs maintain that Detective Charles's conduct was directed specifically at the protected relationship because she falsely told the grand jury that Sumasar appeared not to care about her daughter, despite hearing Sumasar's repeated pleas for an opportunity to call her daughter during the interrogation. In addition, Plaintiffs urge that the extent of the interference was significant: Chiara lost her primary caregiver for over six months.

"Family members have, in general terms, a substantive right under the Due Process Clause to remain together without the coercive interference of the awesome power of the state." *Anthony v. City of New York*, 339 F.3d 129, 142 (2d Cir. 2003) (citations and internal quotation marks omitted).[3] In order to prevail on their claim, Plaintiffs must demonstrate that their separation was "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Id.* (citation and internal quotation marks omitted). "It is not enough that the government act be 'incorrect or ill-advised'; it must be 'conscience-shocking.'" *Cox v. Warwock Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)). "'Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional.'" *Id.* (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999)).

Defendants argue that their conduct in "simply pursuing a criminal investigation based on highly credible, corroborative, sworn evidence by the alleged victims themselves . . . was not so

---

[3] In the complaint, Plaintiffs base this claim in both the First and Fourteenth Amendments. The parties' briefs, however, only address the Fourteenth Amendment. Accordingly, this claim will be analyzed solely under the legal framework of the substantive due process right found in the Fourteenth Amendment.

shocking, arbitrary and egregious so as to violate the Due Process Clause." Defs.' Mem. of Law in Supp. at 33. The Court acknowledges that this is a high standard to meet. Nonetheless, given the questions of fact surrounding Detective Charles's conduct, Defendants' motion for summary judgment on this claim is denied. The Court is not prepared to rule as a matter of law that no reasonable juror could find for Plaintiffs on this claim.

### F. Plaintiffs' State Law Claims

Defendants argue that the Court should decline to exercise supplemental jurisdiction over the state law claims if it dismisses the federal claims. Because the Court denies Defendants' motion for summary judgment with regard to some of the federal claims, Defendants' request is denied.

### CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted in part and denied in part. The Court grants summary judgment with regard to Sumasar's claims for false arrest; Defendants' motion is denied in all other respects. In addition, Plaintiffs voluntarily dismiss all claims against Detective Bershad, Detective Brady, Detective Nill and Police Officer Michael Knatz as well as Count IV of the complaint. Accordingly, these claims are hereby dismissed. The only remaining claims are Counts I-III and V-VII against defendants Nassau County and Detective Charles. However, to the extent Counts I and V assert claims for false arrest, they are dismissed.

Dated: Central Islip, New York
      March 28, 2016

                                      _____/s/_____
                                        Arlene R. Lindsay
                                        United States Magistrate Judge